No. 23–1856

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

LIBERTARIAN NATIONAL COMMITTEE, INC.,

*Plaintiff-Appellee,*

v.

MICHAEL J. SALIBA, *et al*.,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division
Case No. 23-CV-11074
The Honorable Judith E. Levy, District Judge

_____

**BRIEF OF THE DEFENDANTS-APPELLANTS**

Lena Shapiro
Director, First Amendment Clinic
Lilian Alexandrova & Jonathan Resnick
Student Attorneys
University of Illinois College of Law
504 E. Pennsylvania Ave., Suite 241
Champaign, IL 61820
Telephone: (217) 333-4333
Shapiro7@illinois.edu
Law-clinics@illinois.edu

C. Nicholas Curcio
Curcio Law Firm, PLC
16905 Birchview Drive
Nunica, MI 49448
Telephone: (616) 430-2201
ncurcio@curciofirm.com

*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ..........................................................................1

STATEMENT OF ISSUES ..................................................................................2

INTRODUCTION ...............................................................................................3

STATEMENT OF THE CASE ...........................................................................3

    I.     THE JULY 2022 LPM CONVENTION ....................................................3

    II.    MR. CHADDERDON CLINGS TO POWER AND SPLITS THE STATE PARTY.............................................................................................................5

    III.   THE LNC BACKS MR. CHADDERDON, SUES THE DEFENDANTS FOR TRADEMARK INFRINGEMENT, AND SEEKS A PRELIMINARY INJUNCTION............................................................................................7

    IV.   HEARING AND DECISION..................................................................12

SUMMARY OF THE ARGUMENT ....................................................................15

ARGUMENT .......................................................................................................17

    I.     THE DISTRICT COURT ERRED AS A MATTER OF LAW IN APPLYING THE LANHAM ACT TO POLITICAL SPEECH. ..........................17

        A.    The Lanham Act Is Confined to Commercial Speech, Which Is Defined as Expression Related Solely to the Economic Interests of the Speaker. .........18

        B.    Political Speech Is Not Subject to the Lanham Act's Limits. ................22

    II.    THE DISTRICT COURT ERRED IN GRANTING INJUNCTIVE RELIEF WITHOUT REQUIRING PLAINTIFF TO SHOW THAT IT PROPERLY TERMINATED DEFENDANTS' LICENSE TO USE THE "LIBERTARIAN PARTY" MARK. ..................................................................................28

i

III.    THE DISTRICT COURT ABUSED ITS DISCRETION IN HOLDING THAT THE REMAINING EQUITABLE FACTORS WEIGHED IN PLAINTIFF'S FAVOR. ........................................................................32

    A.    The LNC Is Not Injured by The Defendants' Use of the "Libertarian Party" Mark Any More Than Other Political Parties That Have Members with Dissenting Views..................................................................................33

    B.    The Balance of Harms Weighs Against an Injunction That Limits Defendants' Political Expression and Chills the Speech of Other LPM Members...................................................................................................35

    C.    The Public Interest in Protecting Political Speech Weighs Against an Injunction. ..........................................................................................38

ADDENDUM ...................................................................................... A-1

DESIGNATION OF COURT DOCUMENTS .................................... A-2

AMENDMENT I TO THE UNITED STATES CONSTITUTION.................. A-4

STATUTORY PROVISIONS ............................................................ A-5

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. United States*, 509 U.S. 544 (1993) ....................................................35

*All. for Good Gov't v. Coal. for Better Gov't,* 901 F.3d 498 (5th Cir. 2018) .... 18, 27

*Am. Freedom Defense Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885 (6th Cir. 2012).................................................................................. 17, 28

*Bonnell v. Lorenzo,* 241 F.3d 800 (6th Cir. 2001)........................................... 18, 32

*Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672 (9th Cir. 2005)................ 18, 20, 26

*Buckley v. Valeo*, 424 U.S. 1 (1976)................................................................. 25, 39

*Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980)...................................................................................................18

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007)...................................................................................................32

*Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477 (6th Cir. 2002).........17

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998).............................39

*D.T. v. Sumner County Schools*, 942 F.3d 324 (6th Cir. 2019) ..............................33

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474 (6th Cir. 1995) ...............................................................................................................39

*Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532 (6th Cir. 2020) ........................................................................................................16

*Farah v. Esquire Magazine,* 736 F.3d 528 (D.C. Cir. 2013)............................ 18, 23

*Fed. Election Comm'n v. Cruz*, 596 U.S. 289 (2022) .............................................25

*Friendship Materials, Inc. v. Michigan Brick, Inc.* 679 F.2d 100 (6th Cir. 1982)...33

*Gottlieb v. Economy Stores,* 102 S.E.2d 345 (Va. 1958) .........................................30

*Heitmanis v. Austin*, 899 F.2d 521 (6th Cir. 1990)............................................ 16, 39

*Lamparello v. Falwell*, 420 F.3d 309 (4th Cir. 2005)....................................... 22, 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).........22

*Little Caesar Enterprises, Inc. v. R-J-L Foods, Inc.*, 796 F.Supp. 1026 (E.D. Mich. 1992) ....................................................................................................................29

*Madsen v. Women's Health Center, Inc.,* 512 U.S. 753 (1994)...............................36

*Marco's Franchising, LLC v. Soham, Inc.*, 365 F. Supp. 3d 891 (N.D. Ohio 2019)29

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) ...........................21

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014)..................................25

*McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998) ................... 15, 28

*Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343 (D.C. 2005)........................29

*Metropolitan Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 239 F.3d 172 (2d Cir. 2001)............................................35

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001)..............................................31

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ...................................35

*O'Brien v. Brown*, 409 U.S. 1 (1972) .....................................................................39

*Papa John's Int'l, Inc. v. Specktacular Pizza, Inc.,* 2005 WL 3132337 (W.D. Ky. 2005) ....................................................................................................................29

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373 (6th Cir. 1995) ................................................................................................16

*Polaris Amphi. Concerts v. City of Westerville*, 267 F.3d 503 (6th Cir. 2001) ........35

*Porous Media Corp. v. Pall Corp.,* 173 F.3d 1109 (8th Cir. 1999).........................18

*Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001)...................22

*Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219 (6th Cir. 1996)..............17

*Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316 (4th Cir. 2015) ............... *passim*

*Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424 (7th Cir. 2001) ..................................29

*Republican Party of Minnesota v. White*, 416 F.3d 738 (8th Cir. 2005).................25

*Rhinehart v. Scutt*, 509 Fed. Appx. 510 (6th Cir. 2013) .........................................36

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)...................36

*S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371 (3d Cir. 1992).......... 15, 28, 32

*Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379 (5th Cir. 1996)..............................19

*Sheriff v. Medel Elec. Co.*, 412 A.2d 38 (D.C. 1980)...............................................32

*Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003)................................. *passim*

*TMI, Inc. v. Maxwell*, 368 F.3d 433 (5th Cir. 2004)...............................................19

*United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86 (2d Cir. 1997) .................................................................................. 13, 26

*Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research,* 527 F.3d 1045 (10th Cir. 2008)...................................................................................... 18, 20

*Washington State Republican Party v. Washington State Grange*, 676 F.3d 784 (9th Cir. 2012) ...............................................................................................26

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......................................16

**Constitutional Provisions**

U.S. Const. amend. I .......................................................... *passim*

**Statutes**

15 U.S.C. § 1051, *et seq.*...........................................................................1

15 U.S.C. § 1114(a)............................................................................ 15, 28

28 U.S.C. § 1292 ..........................................................................................1

28 U.S.C. § 1331 ..........................................................................................1

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Defendants, Pursuant to Federal Rule of Appellate Procedure 34 and Sixth Circuit Rule 34(a), request oral argument on the instant appeal. At the center of this appeal is an issue of first impression in this Court: Whether the Lanham Act extends to non-commercial political speech like soliciting political donations, filing campaign-finance paperwork, and disseminating political articles and information. Because this issue is important and complex, oral argument will likely aid this Court in adjudicating the appeal.

# STATEMENT OF JURISDICTION

The District Court had jurisdiction over Plaintiff's complaint pursuant to 28 U.S.C. § 1331, as this case involves the application of a federal statute, the Lanham Act, 15 U.S.C. § 1051, *et seq.*

This Court has appellate jurisdiction under 28 U.S.C. § 1292, as Defendants appeal from an interlocutory order of the District Court entered on August 24, 2023, granting Plaintiff's Motion for a Preliminary Injunction. Prelim. Inj., RE 21, Page ID # 1134. The Defendants timely filed and electronically served their Notice of Appeal on September 19, 2023. Notice of Appeal, RE 24, Page ID # 1166.

## STATEMENT OF ISSUES

1.      Whether the Lanham Act extends to non-commercial political speech like soliciting political donations, filing campaign-finance paperwork, and disseminating political articles and information, including criticism of fellow party members.

2.      Whether, to obtain injunctive relief for trademark-infringement, a trademark holder must adduce sufficient facts to show that it properly terminated any license that it previously granted to the Defendants.

3.      Whether the equities favor the District Court's sweeping injunction, which prohibits the Defendants from using the name of the political party to which they undisputedly belong.

**INTRODUCTION**

This case involves an unconstitutional attempt to silence political opponents through use of the Lanham Act. Unlike in an ordinary trademark-infringement case, the Plaintiff and the Defendants are not commercial competitors. Rather, the Defendants are long-time members — and, in the eyes of many, the rightful leaders — of the political party that serves as the Plaintiff's state-level affiliate. The District Court's injunction effectively prohibits the Defendants from using the very name of the political party to which they undisputedly belong, thereby stifling their political expression and violating their First Amendment rights. Further, because the Libertarian Party bylaws require a three-fourths vote of the Plaintiff's members to disaffiliate state-level parties, the Plaintiff has not properly revoked Defendants' permission to use the "Libertarian Party" mark. Given these facts, the District Court erred by granting the preliminary injunction at issue in this appeal.

**STATEMENT OF THE CASE**

**I.      THE JULY 2022 LPM CONVENTION**

In the summer of 2022, the two highest-ranking officers of the Libertarian Party of Michigan ("LPM") resigned from their leadership positions just weeks before the party's candidate-nominating convention. Saliba Decl., RE 16-5, Page ID # 672. In a letter explaining his decision, former-Chair Tim Yow cited hostility from the third-ranking LPM officer at the time, Andrew Chadderdon, and concern with

the ideology of the political caucus to which he belonged. Yow Letter, RE 16-20, Page ID # 801. That caucus, known as the Mises Caucus, had just taken control of the national party by winning most of the leadership positions on the Libertarian National Committee ("LNC"). Thornton Decl., RE 16-1, Page ID # 654.

As a result of the resignations, Mr. Chadderdon ascended to the position of acting chair pursuant to the LPM bylaws. Saliba Decl., RE 16-5, Page ID # 672. Other members of the LPM executive committee were concerned that Mr. Chadderdon would not be able to effectively lead the party because of his poor relationship with party members. *Id.* at 672-673. Heeding these concerns, executive-committee members notified Mr. Chadderdon in mid-June that they intended to call a vote-of-no confidence to remove him from the executive committee during the upcoming convention on July 9, 2022. *Id.* at 673. They further indicated their intent to conduct elections to fill the vacancies on the executive committee. *Id.*

Mr. Chadderdon opposed these efforts and attempted to thwart them. *Id.* In his opening comments at the convention, Mr. Chadderdon indicated that he did not intend to allow votes on his removal or on the filling of executive-committee vacancies. *Id.* The delegates responded to Mr. Chadderdon's obstruction by voting to remove him as convention chair. *Id.* at 674. The delegates then proceeded to remove him from the LPM executive committee via a vote-of-no confidence, which was approved by at least two-thirds (38 of 56) of the delegates present. Convention

Minutes, RE 16-15, Page ID # 758–59. As a result of that vote, Defendant Joe
Brungardt ascended to the position of acting chair. *Id.* at 759. The delegates then
filled the remaining vacancies on the executive committee, most notably electing
Defendant Mike Saliba to the position of first vice chair.[1] Saliba Decl., RE 16-5,
Page ID # 674.

## II.   MR. CHADDERDON CLINGS TO POWER AND SPLITS THE STATE PARTY.

Following the convention, the newly elected executive committee met and
conducted its work without objection for four months. *Id*. Then, in November, Mr.
Chadderdon sent a letter to the LPM's judicial committee asking it to overturn his
removal and void the results of the elections conducted at the convention. Judicial
Committee Decision, RE 12-29, Page ID # 527. The judicial committee is a body
created by the LPM bylaws to decide cases involving alleged violations of the
bylaws or other LPM governing documents. LPM Bylaws, RE 16-6, Page ID # 683.
At the time it received and acted on Mr. Chadderdon's request, the judicial
committee consisted of three of his fellow Mises Caucus members. Saliba Decl., RE
16-5, Page ID # 675.

---

[1] Mr. Saliba later became acting chair when Mr. Brungardt stepped down from the
chair position, which explains why Mr. Saliba is the lead Defendant in this lawsuit.
*See* Saliba Decl., RE 16-5, Page ID # 671.

In support of Mr. Chadderdon's request to the judicial committee, he alleged that the actions taken at the July convention were unlawful because the convention was a "special meeting" for purposes of the bylaws and, as a result, business could only be conducted if it was specifically referenced in the written document calling the meeting. Judicial Committee Decision, RE 12-29, Page ID # 527. Despite the extensive discussion of procedural issues during the July convention and the executive committee meetings leading up to it, no one (including Mr. Chadderdon) had previously suggested this novel interpretation of the party's rules. Saliba Decl., RE 16-5, Page ID # 675. Nevertheless, the judicial committee sided with Mr. Chadderdon and decreed that Mr. Chadderdon was the rightful chair of the executive committee and that the executive-committee appointments made during the July convention were void. Judicial Committee Decision, RE 12-29, Page ID # 535.

The judicial committee's decision resulted in a contentious governance dispute within the party, dividing its members into two factions. Saliba Decl., RE 16-5, Page ID # 676. Mr. Chadderdon, for his part, acted as if the opinion was self-executing and began conducting meetings of an "executive committee" consisting of his political supporters. *Id.*

The Defendants and many other party members believed that the judicial committee lacked the authority to overrule decisions made by the delegates at the convention, and therefore took the position that Mr. Brungardt, Mr. Saliba, and the

other individuals elected at the convention remained in their positions. *Id.* On February 2, 2023, Defendant Brungardt described this position in detail in an email sent to all registered LPM members. LPM Emails, RE 16-9, Page ID # 713–15. After explaining that the appropriate role of the judicial committee is to issue recommendations to the broader assembly, Mr. Brungardt announced that a convention would be held in April 2023 so that party members could discuss the judicial committee's recommendations and decide whether to act on them. *Id.*

## III. THE LNC BACKS MR. CHADDERDON, SUES THE DEFENDANTS FOR TRADEMARK INFRINGEMENT, AND SEEKS A PRELIMINARY INJUNCTION.

Two weeks after Mr. Brungardt's e-mail to LPM members, LNC Chair Angela McArdle sent a letter to Mr. Brungardt informing him that the LNC recognized Mr. Chadderdon as the rightful chair of the LPM executive committee. McArdle Letter, RE 12-10, Page ID # 474–75. The letter further stated that Mr. Brungardt and the other members of the committee he chaired were no longer entitled to use the "Libertarian Party" mark and would be sued for trademark infringement if they continued to do so "in any published materials, including your mailing list, Facebook and social media pages, or any other electronic forum, as well as any other communications, whether electronic, print, audio or any other medium, including but not limited to campaign literature, brochures, advertisements, email or any other communication." *Id.* at 475.

Mr. Brungardt and the other Defendants viewed Ms. McArdle's letter as illegitimate for myriad reasons. For one, the Libertarian Party bylaws prohibit the LNC from taking sides in state-level governance disputes, stating that the "autonomy of affiliate and sub-affiliate parties shall not be abridged by the National Committee." LP Bylaws, RE 12-7, Page ID # 454. Further, the bylaws grant state-level affiliates the right to use the "Libertarian Party" name and require a three-fourths supermajority vote of the LNC to revoke that right. LP Bylaws, RE 12-7, Page ID # 454. Accordingly, the Defendants disregarded the letter and continued engaging in political activities as members of the Libertarian Party. These activities included:

1.  Hosting a well-attended convention in April 2023, at which the delegates discussed the LNC's recognition of Mr. Chadderdon as the chair of the party and nevertheless voted to affirm his prior removal from the chair position by a vote of 58 to 4. Convention Draft Minutes, RE 16-8, Page ID # 696, 711.

2.  Operating a state-party web-site (michiganlp.net) that provided news and information about LPM activities, including articles about the intra-party leadership dispute. Michiganlp.net Screenshots, RE 16-14, Page ID # 747–52.

3.  Operating a separate web-site (lncfight.org) devoted to detailing the dispute with the LNC as well as voicing dissenting opinions with the LNC. Lncfight.org Screenshots, RE 16-13, Page ID # 739–41.

4.     Filing campaign-finance reports on behalf of LPM. *See, e.g.*, April 20, 2023 Statement, RE 12-12, Page ID # 478.

5.     Campaigning for public office in Michigan. LPM Emails, RE 16-9, Page ID # 723 (noting that Mary Buzuma was a candidate for Governor of Michigan in 2022, and Greg Stempfle was a candidate for Secretary of State in 2022).

6.     Engaging in fundraising efforts to support a "legal defense fund" established to provide funding for legal representation in connection with the intra-party governance dispute. Thornton Decl., RE 16-1, Page ID # 649–50. Notably, in late June 2023, the link to the donations page on the michiganlp.net web-site was updated to include the following disclaimer:



**Notice of Ongoing Governance Dispute**

The Libertarian Party of Michigan (LPM) is the state-level affiliate of the Libertarian Party. Since early 2023, there has been a governance dispute in which two separate groups claim to be the be the legitimately elected members of LPM's executive committee, which functions as the party's leadership at the state level. The two groups are operating independently from each other, conducting their own fundraising, and holding party funds in separate accounts.

The funds donated through this webpage will be placed in the management of the executive committee chaired by Mike Saliba. For a detailed explanation of the origins of the governance dispute and the reasons why Mr. Saliba is LPM's legitimately elected chair, please see this letter from LPM's legal counsel.

Notably, the Libertarian National Committee (LNC), which is the governing arm of the Libertarian Party at the national level, has thrown its support behind Mr. Chadderdon. The LNC is currently suing Mr. Saliba and other executive committee members for trademark infringement. Funds donated to the Legal Defense Fund on this website will be used to defend against the trademark suit and in other pending litigation relating to the governance dispute.

If you would like to donate to the rival board chaired by Mr. Chadderdon, you are on the wrong website. The Chadderdon faction's website can be accessed via this link.

Michiganlp.net Screenshots, RE 16-14, Page ID # 745–46.

9

7.    Spending the donations to the legal defense fund in connection with: (a) this lawsuit; (b) a related state court lawsuit involving which board (*i.e.*, the Saliba-led board[2] or the Chadderdon-led board) has the right to control party funds; and (c) a campaign-finance complaint that Ms. McArdle filed against Defendant Angela Thornton. *Id.*; *see also* State Court Complaint, RE 16-7, Page ID # 688–95; FEC Complaint, RE 16-11, Page ID # 727–30.

8.    Filing paperwork with the Michigan Department of Licensing and Regulatory Affairs ("LARA") that lists the members of the Saliba-led board as the directors of LPM's corporate arm. LARA Filing, RE 12-13, Page ID # 588.

9.    Criticizing the LNC's attempts to silence the dissenting LPM members and engage in unprecedented interference with LPM affairs on social media. The following are examples of posts by Mr. Saliba and his supporters:




---

[2] Notably, the eight Defendants in this case are all either members of the Saliba-led board or of local parties that the Saliba-led board considers to be recognized affiliates of LPM, namely, the Libertarian Party of West Michigan and the Libertarian Party of Genesee County. *See* Complaint, RE 1, Page ID # 4.

Saliba Post, RE 12-22, Page ID # 505; Warzybok Decl., RE 16-2, Page ID # 657.

10. Speaking with reporters from the *Detroit News* for a story that later ran on the front page of the paper. *Detroit News* Article, RE 12-39, Page ID # 584–90. According to the story, Defendant Rafael Wolf stated that the LNC's interference with the intra-party dispute was "anti-Libertarian" and that the LNC should let the marketplace decide who controls the state party. *Id.* at 589.

11. Appearing on a local radio show, where Mr. Saliba criticized the LNC and Mr. Chadderdon. Chadderdon Decl., RE 12-41, Page ID # 595.

In early May 2023, the LNC responded to these activities by filing a four-count complaint under the Lanham Act, alleging trademark infringement, unfair competition, and false advertising. Complaint, RE 1, Page ID # 1-19. The complaint specifically pertained to the Defendants' use of the trademarked phrase "Libertarian Party" and the party's logo known as the "Torch Eagle."[3] *Id.* at 5; *id.* at 11. The LNC alleged that the Defendants infringed these marks by using them in connection with political, expressive activity, including: "political party communications, political party activities, political press activity, political candidate screenings, official

---

[3] Shortly after the complaint was filed, the parties filed a joint stipulation in which the Defendants agreed not to use the "Torch Eagle" mark during the pendency of the litigation, without conceding liability for any prior use. Joint Stipulation, RE 11, Page ID # 371-372.

filing[s] and registrations and endorsements" as well as in "soliciting funds from individuals." *Id.* at 11. Importantly, the complaint did not allege that the Defendants' membership in the party had been revoked, nor that the LNC had the power to revoke state-party membership. *See id*. at 1-19. The LNC later acknowledged in other filings that all eight Defendants are still members of the Libertarian Party. Pl.'s Br. in Opp'n. to Defs' Mot. to Stay, RE 30, Page ID # 1217.

About a month after filing the complaint, the LNC moved for a preliminary injunction seeking to preclude the Defendants from using the "Libertarian Party" name. Preliminary Injunction Motion, RE 12, Page ID # 373.

## IV.   HEARING AND DECISION.

The Defendants responded to the preliminary-injunction motion both in writing and at a hearing held in August 2023. The Defendants first argued that the LNC's claims were unlikely to succeed on the merits because this Court, like several others, has construed the Lanham Act as applying only to commercial speech. Defs.' Br. in Resp. to Prelim. Inj. Mot., RE 16, Page ID # 632–35 (citing *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003)) While acknowledging that *Taubman* does not specifically address the activities of a political party, the Defendants cited cases from other circuits indicating that political speech is among the most protected categories of non-commercial speech and is therefore outside the scope of the Lanham Act. *Id.* The District Court found this caselaw unpersuasive, adopting the

12

reasoning from a contrary line of cases that originated with the Second Circuit's decision in *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 88 (2d Cir. 1997). *See* Hearing Transcript, RE 22, Page ID # 1159 (citing a Ninth Circuit case that references the Second Circuit decision).

The Defendants further argued that the LNC could not prevail on its trademark-infringement claim because it failed to properly revoke their license — as members of the Libertarian Party of Michigan — to use the "Libertarian Party" mark. Defs.' Br. in Resp. to Prelim. Inj. Mot., RE 16, Page ID # 636–38. In particular, they argued that the Libertarian Party bylaws are a contractual agreement that authorizes members of "the Party or an organization to which the Party grants affiliate party status" to use the "Libertarian Party" name. *Id.* at 636. The Defendants further emphasized that there was no dispute regarding their status as members of the Libertarian Party of Michigan, and no dispute that the Libertarian Party of Michigan is the recognized state affiliate of the national party. *Id*. Thus, the Defendants argued that the LNC could not summarily revoke their license to use the "Libertarian Party" name unless it followed the specific process set forth in the bylaws, which requires good cause and a three-fourths supermajority vote of the LNC's members. *Id.* at 636-638.

The District Court declined to entertain this argument, stating that it was "not in a position to read the Libertarian Party bylaws and then enforce the bylaws or

interpret the bylaws." Hearing Transcript, RE 22, Page ID # 1145. Thus, it found that the mere fact that the LNC sent a cease-and-desist letter and filed this lawsuit was sufficient to establish unauthorized use of the mark. *See id.* at 1150, 1158.

Finally, with respect to the equitable factors for preliminary injunctions, the District Court asserted that the Defendants were urging it "to determine who the real libertarians are," which it viewed to be outside the scope of the judicial role. Hearing Transcript, RE 22, Page ID # 1145; *accord id.* at 1141–42. Counsel responded that the Defendants were asking the District Court to "do exactly the opposite" by rejecting the LNC's effort to weaponize the Lanham Act against members of its own party. *Id.* at 1142. The District Court found in favor of the LNC with respect to the equitable factors, stating that the LNC would be irreparably harmed by the Defendants' continued to use of the "Libertarian Party" mark because it created a likelihood of confusion between the LNC and the Defendants and put the LNC's reputation at risk. *Id.* at 1160-1161. Thus, the District Court entered an order enjoining the defendants from using the mark. Prelim. Inj., RE 21, Page ID # 1135.

The Defendants timely appealed the District Court's order to this Court pursuant to 28 U.S.C. § 1292(a)(1) and moved the District Court to stay the preliminary injunction pending appeal. Mot. to Stay, RE 25, Page ID # 1168. In support of the motion, the Defendants argued that prohibiting them from using the term "Libertarian Party" would have significant adverse consequences on their

political speech, fundraising efforts, and fundamental political associations. *Id.* at 1173. The District Court denied the motion, finding that the Defendants had not demonstrated irreparable harm because they could still "identify as Libertarians" so long as they did not infringe the "Libertarian Party" mark. Order Denying Stay, RE 32, Page ID # 1241.

## SUMMARY OF THE ARGUMENT

This Court should reverse the District Court's entry of a preliminary injunction because the Plaintiff cannot establish a likelihood of prevailing on its claims under the Lanham Act (the "Act"). First and foremost, the Defendants' political activities are outside the reach of the Lanham Act, which applies only to commercial speech. *Taubman Co.*, 319 F.3d at 774. Moreover, even if the Lanham Act applies, the Plaintiff failed to carry its statutory burden of establishing that it properly terminated the Defendants' prior authorization to use the "Libertarian Party" mark. *See* 15 U.S.C. § 1114(a) (requiring proof that defendant's use was "without consent"); *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998); *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 375 (3d Cir. 1992).

Finally, with respect to the equitable factors for preliminary relief, the District Court's sweeping injunction effectively chooses sides in an intra-party political dispute, and therefore constitutes unwarranted judicial interference in the affairs of

a political party. *See Heitmanis v. Austin*, 899 F.2d 521, 525 (6th Cir. 1990) ("Courts have historically been reluctant to intervene in intra-party disputes.")

## PRELIMINARY INJUNCTION STANDARD

To obtain relief, the movant must establish (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without preliminary injunctive relief; (3) a balance of equities in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A "preliminary injunction is an extraordinary and drastic remedy" that courts should not grant "unless the movant, *by a clear showing*, carries the burden of persuasion." *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020).

Though its entry is reviewed for abuse of discretion, a district court "abuses its discretion" when it "relies on clearly erroneous findings of fact" or "improperly applies the law." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). A district court's factual findings are reviewed "under a clearly erroneous standard, and its legal conclusions de novo." *Id.* And, "in a case such as this, where the district court's decision was made on the basis of a paper record, without a[n] evidentiary hearing," this Court is in "as good a position as the district judge to determine the propriety of granting a preliminary injunction." *Id.* (internal citations omitted).

## ARGUMENT

## I.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN APPLYING THE LANHAM ACT TO POLITICAL SPEECH.

In cases where "First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002). Movant's hurdle to obtain a preliminary injunction becomes "substantially higher: publication must threaten an interest more fundamental than the First Amendment itself." *Id.* (quoting *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 226–27 (6th Cir. 1996)). "Put another way, in the First Amendment context, the other [preliminary injunction] factors are essentially encompassed by the analysis of the movant's likelihood of success on the merits, which is a question of law that must be reviewed de novo." *Am. Freedom Defense Initiative v. Suburban Mobility Auth. for Reg'l Transp*., 698 F.3d 885, 889-90 (6th Cir. 2012).

Here, the District Court erred in holding that the Lanham Act applies to Defendants' political speech, which was a misstep contrary to both the First Amendment and the consensus of this Court's sister circuits. This error was outcome determinative and is sufficient, in-and-of-itself, to warrant reversal of the preliminary injunction. *See Bonnell v. Lorenzo,* 241 F.3d 800, 809, 825 (6th Cir.

2001) (holding that a likelihood of success on the merits is required to obtain an injunction that implicates First Amendment rights).

### A. The Lanham Act Is Confined to Commercial Speech, Which Is Defined as Expression Related Solely to the Economic Interests of the Speaker.

The Sixth Circuit, like at least five others, has held that the Lanham Act would run afoul of the First Amendment's free-speech protections if construed to apply beyond the limited context of commercial speech. *Taubman Co.*, 319 F.3d at 774; *see also All. for Good Gov't v. Coal. for Better Gov't,* 901 F.3d 498, 406 n.8 (5th Cir. 2018) (citing *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316 (4th Cir. 2015) (observing "[a]t least five of our sister circuits"—the D.C., 10th, 9th, 6th, and 8th[4]— "have interpreted ['in connection with the sale ... or advertising of any goods or services' in 15 U.S.C. § 1114(1)(a) of the Lanham Act] as protecting from liability all noncommercial uses of marks")). Commercial speech is defined as "expression related *solely* to the *economic* interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 561 (1980) (emphasis added). This definition establishes the Lanham Act's constitutional perimeter, with a clear boundary that the Lanham Act can only remain

---

[4] *Farah v. Esquire Magazine,* 736 F.3d 528, 541 (D.C. Cir. 2013); *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research,* 527 F.3d 1045, 1052–54 (10th Cir. 2008); *Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 676–77 (9th Cir. 2005); *Taubman Co.,* 319 F.3d at 774; *Porous Media Corp. v. Pall Corp.,* 173 F.3d 1109, 1120 (8th Cir. 1999).

within its constitutional limits so long as it does not attempt to regulate expression relating to interests other than purely economic ones. Any attempt to use the Act to regulate speech beyond the commercial context violates the First Amendment's free-speech protections. *Taubman Co.*, 319 F.3d at 774 (reversing a district court's entry of a preliminary injunction where the Defendant's web-site containing Plaintiff's trademark, was a "fan site" that was not used for commercial purposes and therefore was not subject to the Lanham Act).

This "commercial" boundary was specifically crafted into the Lanham Act to ensure that it "does not infringe on free speech protected by the First Amendment." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 n.6 (5th Cir. 1996) (citing legislative history from § 43(a) of the Lanham Act, which addresses false and misleading descriptions, and explaining that it "should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material [but instead covers] only clearly false and misleading commercial speech."). *See also TMI, Inc. v. Maxwell*, 368 F.3d 433, 436 n.2 (5th Cir. 2004).

In applying the trademark-infringement provisions at issue in this case, the Fourth Circuit has similarly held that the Lanham Act does not reach political speech and editorial comment. Specifically, in *Radiance Found., Inc. v. N.A.A.C.P.*, the Fourth Circuit held that a non-profit was not liable for trademark infringement based

on its use of the plaintiff's marks on a web-site that solicited donations and contained articles criticizing the plaintiff, because the use of the marks was expressive in nature and therefore was not "in connection with" goods or services. *Radiance Found.*, 786 F.3d at 325.

Similarly, in *Bosley Medical Institute, Inc. v. Kremer*, the Ninth Circuit rejected a trademark-infringement claim based on the defendants' creation of a web-site that used the plaintiff's registered mark in order to criticize the medical services offered by plaintiff. *Bosley*, 403 F.3d at 672, 676-77. In doing so, the Court held that "consumer commentary about the products and services represented by the mark— does not constitute infringement under the Lanham Act." *Id.*; *see also Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1052–54 (10th Cir. 2008) (holding that defendant's web-site parodying the plaintiff's web-site and using plaintiff's trademark was not commercial, even though it linked to the web-site of plaintiff's competitor).

In this case, like those discussed above, the speech at issue does not pertain to competing goods or services offered by the Defendants. Rather, the Defendant's speech pertains to advancing political views as members of the Libertarian Party, albeit views that may differ from the LNC leadership. The LNC's broad interpretation of the Lanham Act would lead to the absurd result that the Fourth Circuit warned about in *Radiance Foundation*, namely that:

> Even the most offhand mention of a trademark holder's mark could potentially satisfy the "in connection with" requirement. That interpretation would expand the requirement to the point that it would equal or surpass the scope of the Lanham Act's 'in commerce' jurisdictional element. This would not only make the jurisdictional element superfluous, but would hamper the ability of the "in connection with" requirement to hold Lanham Act infractions within First Amendment limits.

*Radiance Found.*, 786 F. 3d at 325. Such a holding would allow any organization to stifle dissenting speech at the mere mention of its name, resulting in a mass chilling effect of speech overall. This is why courts take great care to protect "expressive rights to comment on social issues under the First Amendment" and "avoid Lanham Act interpretations that gratuitously court grave constitutional concerns." *Id.*, 786 F.3d at 319. A trademark does not grant its owner carte blanche to censor any speech that simply invokes the trademark itself. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) (explaining that the First Amendment offers little protection for a competitor who labels its commercial goods with a confusingly similar mark, but that "[t]rademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view.") (internal citations omitted)

This type of censorship is exactly what the LNC seeks to achieve in this case. The Defendants' activities, including their creation of various web-sites, social media posts, campaign efforts, etc., are all for the principal purpose of expressing political beliefs and providing information on political matters to the voters of

21

Michigan. And while part of those efforts includes solicitation of political contributions, the solicitations include disclaimers explaining the divide between the Chadderdon faction and Defendants. Most importantly, all of Defendants' actions advance the cause of the Libertarian Party, even if not in the form that the Plaintiff would prefer.

### B. Political Speech Is Not Subject to the Lanham Act's Limits.

The District Court's preliminary injunction allows Plaintiff to engage in unconstitutional censorship by permitting suppression of criticism and broader political expression and activity merely because such speech invokes the name of a political party. Yet the Lanham Act's reach is not unlimited, nor did Congress "intend for trademark laws to impinge the First Amendment rights of critics and commentators." *Radiance Found.*, 786 F.3d at 321 (citing *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005); s*ee also Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 567 (5th Cir. 2001) (remanding a Lanham Act claim brought by a manufacturer and noting that if a finder of fact holds that the motivation behind a competing distributors' repetition to other distributors of a rumor relating to the manufacturer's non-economic political or religious values, "the speech was non-commercial, and no Lanham Act claim is available"), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

In *Lampanello*, the Fourth Circuit held that the defendant's "www.fallwell.com" domain name for a web-site expressly critical of Reverend Jerry Falwell's views on homosexuality did not infringe Reverend Falwell's trademark rights in his name. *Lampanello*, 420 F.3d at 314. The Court specifically noted:

> Trademark law serves the important functions of protecting product identification, providing consumer information, and encouraging the production of quality goods and services. But protections against unfair competition cannot be transformed into rights to control language. Such a transformation would raise serious First Amendment concerns because it would limit the ability to discuss the products or criticize the conduct of companies that may be of widespread public concern and importance. Much useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark.

*Id.* at 313 (internal quotations and citations omitted). Other circuit courts have made similar observations *See, e.g.*, *Farah*, 736 F.3d at 531 (dismissing a Lanham Act claim brought by an author against a blogger whose post contained political speech where defendant blogger posted an article criticizing the plaintiff author's book and holding that the blog post did not constitute commercial speech because it "was fully protected political satire," and "compet[ition] in the marketplace of ideas is not sufficient to invoke the Lanham Act.")

Here, the District Court's preliminary injunction prevents Defendants from engaging in protected activities, such as criticizing their own political party,

campaigning, and fundraising for elected offices as members of the Libertarian Party. This Court has emphasized that the use of a mark as criticism and commentary indicates that the speech is political in nature and outside the scope of the Act. *Taubman Co.*, 319 F.3d at 778. The Fourth Circuit has also recognized the importance of criticism and commentary in separating political from commercial speech, explaining that trademark law in general. . . [is not the] proper vehicle[] for combatting speech with which one does not agree." *Radiance Found.* 786 F.3d at 319. "The most scathing speech and the most disputable commentary are also the ones most likely to draw their intended targets' ire and thereby attract Lanham Act litigation. It is for this reason that law does not leave such speech without protection." *Id.* at 332.

As members of the Libertarian Party, Defendants have used Plaintiff's mark exclusively in the political speech and expression context, including for criticism and commentary,[5] to promote their own views as members of the Libertarian Party, and to promote candidates for public office.[6] These activities receive the strongest protection offered by the First Amendment. As the Supreme Court has noted: "The First Amendment has its fullest and most urgent application precisely to the conduct

---

[5] *E.g.*, Saliba Post, RE 12-22, Page ID # 505.

[6] LPM Emails, RE 16-9, Page ID # 723 (noting that Mary Buzuma was a candidate for Governor of Michigan in 2022, and Greg Stempfle was a candidate for Secretary of State in 2022).

of campaigns for political office." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 302 (2022) (internal citations omitted); *see also McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203-04 (2014) (noting that participation in an electoral debate is "integral to the operation of the system of government established by our Constitution.")

The Supreme Court has further held that monetary contributions to a political campaign are political speech. *See Buckley v. Valeo*, 424 U.S. 1 (1976). The Court expressly noted that limits on campaign contributions constitute "direct and substantial restraints on the quantity of political speech." *Buckley*, 424 U.S. at 22. Lower courts have reaffirmed the importance of campaign contributions in the context of political parties. For example, the Eighth Circuit struck down provisions of an ethical canon for judicial conduct that prohibited the solicitation of party endorsement and campaign contributions as "chill[ing], even kill[ing], political speech and associational rights." *Republican Party of Minnesota v. White*, 416 F.3d 738, 746 (8th Cir. 2005).

For these reasons, well-established precedent from the Supreme Court, this Court, and least five of this Court's sister circuits compel the conclusion that the Lanham Act does not extend to the type of political party activities of which the LNC complains in this case, namely "political party communications, political party activities, political press activity, political candidate screenings, official filing[s] and

registrations and endorsements" as well as "soliciting funds from individuals." Complaint, RE 1, Page ID # 11. The only circuit to have seriously considered the issue and held otherwise is the Second Circuit,[7] which did so long before *Taubman* and many of the companion cases discussed above.

The Second Circuit's decision in *United We Stand America, Inc.*, is both factually distinguishable from the present case and inconsistent with the constitutional parameters of the Lanham Act articulated in *Taubman* and its companion cases. *United We Stand* involved the use of the plaintiff's registered campaign slogan by a *separate* political organization, no longer affiliated with plaintiff's presidential campaign. *United We Stand*, 128 F.3d at 90. The Second Circuit expressed concern that such use of a trademark was problematic because it could lead to confusion between two entirely separate entities. *Id.* The present case is factually distinguishable because the Defendants are *members* of Plaintiff's political party. Their speech does not attempt to confuse voters about that

---

[7] Notably, the District Court in this case cited the Ninth Circuit's decision in *Washington State Republican Party v. Washington State Grange*, 676 F.3d 784 (9th Cir. 2012). However, that case merely recites the holding in *United We Stand* without providing any analysis of the issue. *See id.* at 795. Such analysis was unnecessary, because the Court ultimately dismissed the trademark-infringement claim for other reasons. *Id*. Moreover, the Ninth Circuit has held in a series of other cases, consistent with this Court, that the Lanham Act does not extend to non-commercial speech. *See, e.g.*, *Bosley*, 403 F.3d at 676-77.

26

membership (which is undisputed), but rather voices dissent within the Libertarian Party.

More importantly, the Second Circuit's decision in *United We Stand* is simply wrong as a matter of statutory interpretation and First Amendment jurisprudence. As Judge Dennis of the Fifth Circuit recently noted, the Second Circuit is the "sole outlier court in an otherwise uniform line of federal appellate authority holding that the Lanham Act does not apply to noncommercial speech." *All. for Good Gov't*, 998 F.3d at 674 n.4 (Dennis, J., dissenting).  In a tightly reasoned separate opinion addressing an issue not reached by the panel majority, he explains in detail that the Second Circuit's decision in *United We Stand* is "incorrect that purely political speech is a 'service' under the Lanham Act," and further explains why such a construction would "stifle[e] the political speech that is key to the functioning of our democracy." *Id.* at 677 n.5. Indeed, if other political parties in this country were subjected to these restrictions, the pool of candidates within each party would rapidly shrink, resulting in a form of "identical toy soldiers" released as candidates for each party, dictated by whoever can get a hold of the reigns of the national party. Thus, consistent with Judge Dennis's reasoning, applying the Lanham Act to speech like that at issue in this case is so "clearly erroneous and manifestly unjust" that a court should raise the issue *sua sponte*, even where the defendant fails to do so. *Id.*

For these reasons, this Court should reject the District Court's overextension of the Lanham Act to political activities, finding that it is inconsistent with the principles underlying the First Amendment and the protections that the Constitution affords political speech.

## II.    THE DISTRICT COURT ERRED IN GRANTING INJUNCTIVE RELIEF WITHOUT REQUIRING PLAINTIFF TO SHOW THAT IT PROPERLY TERMINATED DEFENDANTS' LICENSE TO USE THE "LIBERTARIAN PARTY" MARK.

As explained above, when a preliminary injunction implicates First Amendment rights, this Court reviews the movant's likelihood of success on the merits de novo. *Am. Freedom Defense Initiative*, 698 F.3d at 890. To prevail on a claim for trademark infringement under the Lanham Act, a plaintiff must show that a person has "*without the consent of the registrant* . . . . use[d] in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark . . . ." 15 U.S.C. § 1114(a) (emphasis added). Thus, by its plain wording, the Lanham Act indicates that lack of consent is an element of trademark infringement on which the plaintiff bears the burden of proof. See *id.* As a result, where a defendant claims to a have a contractual license to use the trademark at issue, a plaintiff seeking injunctive relief make "some type of showing that [it] properly terminated the contract purporting to authorize the trademarks' use." *McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998); *S & R Corp.*, 968 F.2d at 375 ("[Plaintiff] will merit preliminary injunctive relief if it can adduce sufficient facts indicating that its

termination of [defendants'] franchises was proper."); *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 430 (7th Cir. 2001) (discussing whether the plaintiff complied with state law requiring notice of default prior to termination of the license).

District courts within this circuit widely follow this rule and have noted that this Court's sister circuits appear to be unanimous in its adoption. *See Marco's Franchising, LLC v. Soham, Inc.*, 365 F. Supp. 3d 891, 895 (N.D. Ohio 2019); *Papa John's Int'l, Inc. v. Specktacular Pizza, Inc.,* 2005 WL 3132337, at *3 (W.D. Ky. 2005) (noting the unanimity of other circuits); *Little Caesar Enterprises, Inc. v. R-J-L Foods, Inc.*, 796 F.Supp. 1026, 1030 (E.D. Mich. 1992) (framing trademark dispute between franchisor and terminated franchisee around whether franchisor properly terminated franchise agreement).

In this case, the District Court failed to hold the LNC to its statutory burden of establishing that it properly terminated the Defendants' prior authorization to use the "Libertarian Party" mark. *See* Hearing Transcript, RE 22, Page ID # 1145, 1150, 1158. In ruling from the bench, the District Court expressly declined to consider the license granted in the Libertarian Party bylaws, *id.* at 1145, even though the bylaws constitute a legal contract between the party and its members, *see, e.g.*, *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005); *Gottlieb v. Economy*

*Stores,* 102 S.E.2d 345, 351 (Va. 1958).[8] If the District Court had been willing to do so — as required by the plain text of the Lanham Act — it would have been apparent that the LNC made no effort to properly terminate the Defendants' rights in the manner required under the bylaws.

To begin, article 5, section 1 of the Libertarian Party bylaws provides that "[n]o person, group, or organization may use the name 'Libertarian Party' or any confusingly similar designation except the Party or an organization to which the Party grants affiliate party status or as otherwise provided in these bylaws." LP Bylaws, RE 12-7, Page ID # 454. In light of this language, the LNC admits in its complaint that "chartered affiliates are licensed to use the LNC's federally registered trademarks." Complaint, RE 1, Page ID # 3.

Second, article 5, section 6 of the bylaws prescribes a process for the disaffiliation of affiliate parties, stating in pertinent part:

> The National Committee shall have the power to revoke the status of any affiliate party, for cause, by a vote of 3/4 of the entire National Committee. A motion to revoke the status of an affiliate party for cause must specify the nature of the cause for revocation.

LP Bylaws, RE 12-7, Page ID # 454.

Third, article 5, section 5 provides in its entirety: "The autonomy of the affiliate and sub-affiliate parties shall not be abridged by the National Committee or

---

[8] The LNC was incorporated in the District of Columbia and has its principal offices in Virginia. Complaint, RE 1, Page ID # 1.

any other committee of the Party, except as provided by these bylaws." *Id.* No other provision of the bylaws authorizes the LNC to choose between competing factions in a governance dispute within an affiliate party, nor do the bylaws authorize the LNC to revoke, suspend, or otherwise terminate membership in a state-level party. *See id.* at 453–461.

When read together, the relevant provisions of the bylaws do not support the LNC's claim that it can prohibit the members of state-level affiliates from using its trademarks simply by sending a cease-and-desist letter signed by the LNC Chair. The bylaws expressly grant state-level affiliates the right to use the "Libertarian Party" mark and prescribe a single procedure for disaffiliation. That procedure (1) applies only to state-level parties as a whole, not to individual members; (2) requires a ¾ supermajority vote of the LNC; and (3) can be invoked only for cause. *Id.* at 454. Because this is the only procedure mentioned, ordinary principles of interpretation compel the conclusion that it is the exclusive disaffiliation procedure available to the LNC. *See Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.")

Accordingly, because Ms. McArdle's cease-and-desist letter to Mr. Brungardt exceeded her powers under the bylaws, it was ineffective in revoking the Defendants' contractual license to use the LNC's marks. *See, e.g.*, *Sheriff v. Medel*

31

*Elec. Co.*, 412 A.2d 38, 41 (D.C. 1980) (holding that the termination of a contract is ineffectual if proper procedures are not followed). The District Court therefore erred in granting a preliminary injunction where the plaintiff failed to "adduce sufficient facts indicating that its termination of [defendants' license] was proper." *See, e.g.*, *S & R Corp.*, 968 F.2d at 375.

## III.   THE DISTRICT COURT ABUSED ITS DISCRETION IN HOLDING THAT THE REMAINING EQUITABLE FACTORS WEIGHED IN PLAINTIFF'S FAVOR.

When a preliminary injunction implicates First Amendment rights, a movant's failure to show a likelihood of success on the merits is dispositive and eliminates the need to consider the other equitable factors. *Bonnell*, 241 F.3d at 809. To the extent this Court disagrees with the arguments above and determines that the LNC is likely to succeed on the merits of its Lanham Act claims, it would review the District Court's "ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief . . . for abuse of discretion." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007). Here, the District Court improperly balanced the LNC's potential harm with the potential harm to the Defendants and the general public interest.

**A. The LNC Is Not Injured by The Defendants' Use of the "Libertarian Party" Mark Any More Than Other Political Parties That Have Members with Dissenting Views.**

A showing of irreparable harm is indispensable in seeking a preliminary injunction. *See D.T. v. Sumner County Schools*, 942 F.3d 324, 327 (6th Cir. 2019). As this Court has explained, if "the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* (emphasis omitted). Further, to "merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." *Id.* "[T]he likelihood of success that needs be shown (for a preliminary injunction) [varies] inversely with the degree of injury the plaintiff will suffer absent an injunction." *Friendship Materials, Inc. v. Michigan Brick, Inc.* 679 F.2d 100, 105 (6th Cir. 1982).

In granting the preliminary injunction in this case, the District Court commented that a likelihood of confusion between the Plaintiff and the Defendants or a risk to the Plaintiff's reputation satisfies the irreparable-injury requirement. Hearing Transcript, RE 22, Page ID # 1145. While this may be true in the typical trademark-infringement case, it should be insufficient here. For one, the Plaintiff and the Defendants are undisputedly members of the same organization, so to some extent it is inevitable that they will be associated with one another. Despite that inevitable association, however, the Defendants have — through the very activities at issue in this case — made clear that they disagree with the LNC on a variety of

issues, and that the LNC rejects their claim to be the legitimate leaders of the state party. *See supra* Statement of Facts, Section C.

Second, the Plaintiff's purported reputational harms are purely political and have nothing to do with commercial interests. In its filings in the District Court, the LNC characterized its potential reputational harm as the risk that "voters will be misled as to the positions and platform of the true 'Libertarian Party.'" Pl.'s Prelim. Inj. Reply Br., RE 17, Page ID # 820. Even if that were true, it would not constitute "confusion" for purposes of the Lanham Act, since the Lanham Act applies only to commercial speech. *See supra* Argument, Section I. As the Fourth Circuit has held, "trademark infringement is not designed to protect mark holders from consumer confusion about their positions on political or social issues." *Radiance Found*, 786 F.3d at 327.

Thus, as a political party, the LNC is not injured by the Defendants' use of the "Libertarian Party" mark any more than other political parties with members that voice dissenting views. While it may be advantageous for factions within a political party to distance themselves from internal criticism, that is simply not what the Lanham Act is for. Indeed, even if Congress had intended for the Act to be used in this way (which is unlikely), it could not constitutionally enact such a sweeping tool for silencing political opponents.

**B. The Balance of Harms Weighs Against an Injunction That Limits Defendants' Political Expression and Chills the Speech of Other LPM Members.**

In First Amendment jurisprudence, the term "prior restraint" describes administrative and judicial orders that block expressive activity before it can occur. *Polaris Amphi. Concerts v. City of Westerville*, 267 F.3d 503, 506 (6th Cir. 2001). "Temporary restraining orders and permanent injunctions — *i.e.*, court orders that actually forbid speech activities — are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993). "Any system of prior restraints of expression [bears] a heavy presumption against its constitutional validity," and a party who seeks to have such a restraint upheld "thus carries a heavy burden of showing justification for the imposition of such a restraint." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (citations omitted). "Indeed, prior restraints are 'the most serious and the least tolerable infringement on First Amendment rights.'" *Metropolitan Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001).

Here, the District Court's preliminary injunction seemingly bars Defendants — official party members — from using the "Libertarian Party" mark for any purpose associated with their political activities as LPM members. *See* Prelim. Inj., RE 21, Page ID # 1134 (granting Plaintiff's motion in full); Complaint, RE 1, Page ID # 11 (describing Defendants' infringing activities to include "political party

35

communications, political party activities, political press activity, political candidate screenings, official filing[s] and registrations and endorsements" as well as "soliciting funds from individuals"). As a result, it imposes a significant prior restraint on their rights of expression that raises serious constitutional concerns. This weighs against the issuance of the injunction because, as the Supreme Court recently explained: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

In addition, the Supreme Court has cautioned against overbroad injunctions, especially when First Amendment considerations are at stake. Thus, an injunction must "burden no more speech than necessary to serve a significant government interest." *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 765 (1994). In analyzing this risk, a court must consider not only the speech of the parties to the case, but also the speech of related third parties. *Rhinehart v. Scutt*, 509 Fed. Appx. 510, 515 (6th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008).

In this case, the District Court's preliminary injunction not only burdens the Defendants' free-speech rights, but also the rights of LPM members who support the Saliba-led board but were not named as defendants. Evidence in the record indicates that there are many such members, some of whom are inclined toward activism on

36

social media. For example, the record shows that fifty-eight LPM members attended the convention that that the Defendants hosted in April 2023, and that all but four of them voted to affirm Mr. Chadderdon's removal from the LPM executive committee. Convention Draft Minutes, RE 16-8, Page ID # 711. It also shows that individuals who were not named in the suit, such as Brandon Warzybok and former lieutenant-governor candidate Brian Ellison, have actively supported the Defendants' claim to being the rightful leaders of the party and have posted anti-LNC memes on social media. *See, e.g.*, Warzybok Decl., RE 16-2, Page ID # 655–57; Ellison Decl., RE 16-3, Page ID # 658–62.

The District Court's preliminary injunction burdens the speech and associational rights of these members in at least two ways. First, it silences the individuals whom they believe are the rightful leaders of the party (*i.e.*, the Defendants in this case), making it harder for the Defendants to steer the party in the direction the non-Defendant members would prefer. Second, it sends the chilling message that criticizing the LNC or the Chadderdon faction while remaining members of the party constitutes trademark infringement and could result in legal liability. This message inevitably impacts the exercise of free-speech rights far beyond the immediate parties to this case.

Finally, in granting the preliminary injunction, the District Court failed to adequately weigh two significant facts that counsel against the need for injunctive

relief under the Lanham Act. For one, as described above, the Defendants have been open and honest about their disagreements with the LNC and have worked hard to mitigate any confusion as to whether the LNC supports their claim to being the rightful leaders of the LPM. *See supra* Statement of Facts, Section C. Perhaps most notably, the Defendants posted a lengthy disclaimer on the "Donation" page on michiganlp.net that describes the intra-party governance dispute in detail, provides a link to the Chadderdon faction's web-site, and states that "the Libertarian National Committee (LNC) . . . has thrown its support behind Mr. Chadderdon." Michiganlp.net Screenshots, RE 16-14, Page ID # 745–46. This Court has held that such disclaimers can be effective in preventing consumer confusion and are a relevant factor when considering injunctive relief. *See Taubman Co.,* 319 F.3d at 776–77. Further, to the extent the Defendants are violating state law or federal campaign-finance law through their fundraising efforts (as the LNC contends), any such violation could be addressed in the state-court case or in the pending matter before the Federal Election Commission. The availability of these alternative forums could mitigate the harm that the LNC alleges it will suffer in the absence of the District Court's injunction.

### C. The Public Interest in Protecting Political Speech Weighs Against an Injunction.

"[T]he public as a whole has a significant interest in ensuring . . . protection of First Amendment liberties." *Dayton Area Visually Impaired Persons, Inc. v.*

*Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (noting that "it is always in the public interest to prevent the violation of a party's constitutional rights"). The public inherently has an interest in protecting First Amendment rights because political speech, like Defendants' political speech and fundraising efforts, is the centerpiece of our democratic republic. *Buckley*, 424 U.S. at 14 ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution.")

Further, there is an immense public interest in allowing political speech and processes to function free from judicial intervention. The Sixth Circuit has recognized that courts "have historically been reluctant to intervene in intra-party disputes." *Heitmanis v. Austin*, 899 F.2d 521, 525 (6th Cir. 1990). Further, the Supreme Court has commented: "It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes . . . ." *O'Brien v. Brown*, 409 U.S. 1, 4 (1972). Here, while the District Court claimed that its decision was politically neutral, Hearing Transcript, RE 22, Page ID # 1141–42 1145, in reality it achieved the opposite result. By granting the sweeping injunction at issue in this case, the District Court effectively allowed one faction within the LPM to continue calling itself the "Libertarian Party of Michigan" while prohibiting

39

the other faction from doing so. Permitting the Lanham Act to be used to silence political opponents in this way is both unconstitutional and a significant departure from this Court's tradition of non-interference in political-party affairs.

## CONCLUSION

For these reasons, Defendants respectfully request that this Court vacate the District Court's entry of a preliminary injunction order.

Respectfully submitted,

*/s/ Lena Shapiro*
Lena Shapiro
*Director, First Amendment Clinic*
Lilian Alexandrova
Jonathan Resnick
*Student Attorneys*
University of Illinois College of Law
504 E. Pennsylvania Ave., Suite 241
Champaign, IL 61820
Telephone: (217) 333-4333
Shapiro7@illinois.edu

*/s/ C. Nicholas Curcio*
C. Nicholas Curcio
Curcio Law Firm, PLC
16905 Birchview Drive
Nunica, MI 49448
Telephone: (616) 430-2201
ncurcio@curciofirm.com

*Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9056 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

Respectfully submitted,

/s/ Lena Shapiro
LENA SHAPIRO
Director, First Amendment Clinic

November 27, 2023

## CERTIFICATE OF SERVICE

I, Lena Shapiro, hereby certify that on November 27, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

/s/Lena Shapiro
LENA SHAPIRO
Director, First Amendment Clinic

**ADDENDUM**

DESIGNATION OF COURT DOCUMENTS…………..……………………A-2

AMENDMENT I TO THE UNITED STATES CONSTITUTION………..…....A-4

STATUTORY PROVISIONS……………………………………………A-5

**DESIGNATION OF COURT DOCUMENTS**

*Libertarian National Committee, Inc. v. Mike Saliba, et al.*,
No. 23-cv-11074 (E.D. Mich.)

| Docket Entry No. | Description | Page ID # |
|---|---|---|
| 1 | Complaint | 1–19 |
| 11 | Joint Stipulation | 371–372 |
| 12 | Plaintiff's Motion for Preliminary Injunction | 373–424 |
| 12-7 | LP Bylaws | 451–467 |
| 12-12 | April 20, 2023 Statement | 478 |
| 12-13 | LARA Filing | 479–487 |
| 12-22 | Saliba Post | 505-509 |
| 12-29 | Judicial Committee Decision | 527–539 |
| 12-39 | *Detroit News* Article | 584–590 |
| 12-41 | Declaration of Andrew Chadderdon | 592–598 |
| 16 | Defendant's Response to Motion for Preliminary Injunction | 611–646 |
| 16-1 | Declaration of Angela Thornton | 647–654 |
| 16-2 | Declaration of Brandon Warzybok | 655–657 |
| 16-3 | Declaration of Brian Ellison | 658–662 |
| 16-5 | Declaration of Michael Saliba | 671–677 |
| 16-6 | LPM Bylaws | 678–687 |
| 16-7 | State Court Case Complaint | 688–695 |
| 16-8 | April 1 Convention Draft Minutes | 696–712 |
| 16-9 | LPM Emails | 713–724 |
| 16-11 | FEC Complaint | 727-730 |
| 16-13 | Lncfight.org Screenshots | 739-744 |
| 16-14 | Michiganlp.net Screenshots | 745–756 |
| 16-15 | July 9 Convention Minutes | 757–769 |
| 16-20 | Tim Yow Resignation Letter | 801 |
| 17 | Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Preliminary Injunction | 815–822 |
| 21 | Preliminary Injunction Order | 1134–1135 |
| 22 | Hearing Transcript | 1136–1164 |
| 24 | Notice of Appeal | 1166–1167 |
| 25 | Defendants' Motion to Stay Pending Appeal | 1168–1177 |

| 30 | Plaintiff's Brief in Opposition to Defendants' Motion to Stay | 1215–1226 |
| 31 | Defendants' Reply Brief in Support of Motion to Stay | 1227–1234 |
| 32 | Order Denying Defendants' Motion to Stay Pending Appeal | 1235–1242 |

## AMENDMENT I TO THE UNITED STATES CONSTITUTION

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## STATUTORY PROVISIONS

### 15 U.S.C. 1114(1)

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

As used in this paragraph, the term "any person" includes the United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, or other persons acting for the United States and with the authorization and consent of the United States, and any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. The United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, other persons acting for the United States and with the authorization and consent of the United States, and any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

15 U.S.C. 1125(a)(1)

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.