No. 23–1856

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

LIBERTARIAN NATIONAL COMMITTEE, INC.,

Plaintiff-Appellee,

v.

MICHAEL J. SALIBA, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court

for the Eastern District of Michigan, Southern Division

Case No. 23-CV-11074

The Honorable Judith E. Levy, District Judge

---

# *AMICI CURIAE* BRIEF OF INTELLECTUAL PROPERTY LAW PROFESSORS IN SUPPORT OF NEITHER PARTY

---

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for Amici Curiae*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ ii
**IDENTITY OF AMICI CURIAE AND INTEREST IN THIS CASE** ........ 1
**SUMMARY OF ARGUMENT** ........ 1
**ARGUMENT** ........ 2
I. THE FIRST AMENDMENT STRONGLY PROTECTS NONCOMMERCIAL SPEECH, INCLUDING POLITICAL SPEECH ........ 2
II. THE LANHAM ACT IS NOT WELL SUITED TO RESOLVE POLITICAL DISPUTES ........ 3
III. ANY LANHAM ACT REMEDIES APPLIED TO NONCOMMERCIAL POLITICAL SPEECH MUST BE NARROWLY TAILORED ........ 8
A. Materiality ........ 9
B. More Speech Is Favored Over Less ........ 10
**CONCLUSION** ........ 13
**APPENDIX A** ........ 14
**CERTIFICATE OF COMPLIANCE** ........ 15
**CERTIFICATE OF SERVICE** ........ 16

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abitron Austria GmbH v. Hetronic, Int'l, Inc.*, 600 U.S. 412 (2023)....................4, 7

*Alliance for Good Government v. Coalition for Better Government*, 998 F.3d 661 (5th Cir. 2021) ...............................................................................................12

*Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005) ...................6

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011).........................................3, 8

*Choose Energy, Inc. v. American Petroleum Institute*, 87 F.Supp.3d 1218 (N.D. Cal. 2015) ....................................................................................................4

*Citizens United v. FEC*, 558 U.S. 310 (2010).......................................................11

*Cohen v. California,* 403 U.S. 15 (1971)................................................................8

*E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992)................6

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) .........................................10

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995).............................................3

*International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.*, 914 F.Supp. 651 (D. Me. 1996) ..........................................5

*International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196 (1st Cir. 1996) ................................................5

*Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023)..........4, 6

*Matal v. Tam*, 582 U.S. 218 (2017) ..........................................................................8

*McCutcheon v. FEC*, 572 U.S. 185 (2014).........................................................11

*New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992) ....................................................................................................................8

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)............................................3

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000)..........................................12

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 363 F. Supp. 3d 94 (D.D.C. 2019)........................................................................................................................2

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ...............................................................................................................2, 8

*Radiance Found., Inc. v. NAACP*, 786 F.3d 316 (4th Cir. 2015).............................5

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ........................................................8

*Renna v. County of Union, N.J.*, 88 F.Supp.3d 310 (D.N.J. 2014)...........................7

*Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781 (1988)...............................2

*Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016) ....................................................3

*Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016) ......................8, 10

*U.S. v. United Foods, Inc.*, 533 U.S. 405 (2001) ....................................................2
*United States v. Alvarez*, 567 US 709 (2012) ..........................................................9
*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)..........................12
*United States v. Stevens*, 559 U.S. 460 (2010) .......................................................2
*United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86 (1997).................................................................................................................6
*Utah Republican Party v. Herbert*, 141 F.Supp.3d 1195 (D. Utah 2015).................6
*Wash. State Republican Party v. Wash. State Grange*, 676 F.3d 784 (9th Cir. 2012) ..........................................................................................................................5

**Statutes**

15 U.S.C. § 1127 ..................................................................................................4, 7
Federal Rule of Appellate Procedure 29(a)(2)..........................................................1
Federal Rule of Appellate Procedure 29(a)(4)(E)......................................................1

**Other Authorities**

Mark A. Lemley & Mark P. McKenna, *Irrelevant Confusion*, 62 Stanford L. Rev. 413 (2010).............................................................................................................9
Mark P. McKenna, *Testing Modern Trademark Law's Theory Of Harm*, 95 IOWA L. REV. 63, 97-107 (2009) ..........................................................................................9
Rebecca Tushnet, *Gone in Sixty Milliseconds: Trademark Law and Cognitive Science*, 86 TEX. L. REV. 507, 543-44 (2008) .......................................................9
Eugene Volokh & Brett McDonnell, *Freedom of Speech and Independent Judgment Review in Copyright Cases*, 107 Yale L.J. 2431, 2446 n.84 (1998) .....4

## IDENTITY OF AMICI CURIAE AND INTEREST IN THIS CASE

*Amici*, listed in Appendix A, are scholars whose research and teaching focus is trademark and intellectual property law.[1] *Amici* have no direct interest in the outcome of this litigation, and take no position thereon. Our sole interest is in the orderly development of trademark law to serve the public interest.[2]

## SUMMARY OF ARGUMENT

In general, regulations of noncommercial speech on the basis of their content must survive strict scrutiny. Noncommercial speakers do not need good reasons to be allowed to speak freely. Rather, the government requires a compelling interest to stop them. In the absence of a strong governmental interest such as protection against material consumer deception, invasion of privacy, or defamation, the government lacks such an interest. Situations resembling traditional fraud, in which people are materially deceived, can satisfy strict scrutiny even if they do not occur in traditional commercial transactions. But where a statute covers far more

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person—other than the *amici*, their members, or their counsel—contributed money that was intended to fund the preparation or submission of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief.

[2] *Amici's* institutional affiliations are provided only for purposes of identification.

than fraud, as the Lanham Act does, courts must be extremely careful to confine its scope when applying it to noncommercial speech, especially political speech. Several doctrinal tools are available to this Court in order to impose the necessary limitations, especially on the scope of any remedy.

## ARGUMENT

### I. The First Amendment Strongly Protects Noncommercial Speech, Including Political Speech

First Amendment doctrine recognizes important differences between commercial speech—roughly, speech that proposes a commercial transaction, *U.S. v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)—and noncommercial speech, even speech that solicits monetary donations. *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988). Charitable and political activities often require monetary support, but this does not take them out of the heart of First Amendment protection. *See id.*; *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 363 F. Supp. 3d 94 (D.D.C. 2019), *aff'd*, 831 F.3d 500 (D.C. Cir. 2016).

Laws that regulate noncommercial expression based on its content are ordinarily unconstitutional, as "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Such regulations of noncommercial speech must satisfy strict scrutiny. *Brown v. Ent.*

*Merchants Ass'n*, 564 U.S. 786, 790 (2011); *see also Sarver v. Chartier*, 813 F.3d 891, 903-04 (9th Cir. 2016) (applying strict scrutiny to right of publicity claim against noncommercial speech). Regulation of commercial speech to avoid concrete consumer harms is justified, but this very truism motivated the Supreme Court to caution that "to require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (citation omitted). Applying the Lanham Act to political speech, without extreme care, risks exactly that dilution.

## II. The Lanham Act Is Not Well Suited To Resolve Political Disputes

The Lanham Act is directed at protecting consumers from deception in the marketplace; it is less well suited to protecting citizens against deception in the marketplace of ideas. Civil claims can create First Amendment harms as surely as state enforcement, and be "markedly more inhibiting." *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964). "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law." *Id.; see also* Eugene Volokh & Brett McDonnell, *Freedom of Speech and Independent Judgment Review in Copyright Cases*, 107 Yale L.J. 2431, 2446 n.84

(1998) (private enforcement can be more dangerous to speech because it can be more pervasive and effective).

As the Supreme Court recently observed, the core evil of the Lanham Act is deception about the source of goods (and services). *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140, 153 (2023) (use "as a designation of source of the infringer's own goods" is use "in the way the Lanham Act most cares about"). Although services are also covered, and although political activities can be characterized as services, political speech does not fit the core model of use in the course of "trade." See *Abitron Austria GmbH v. Hetronic, Int'l, Inc.*, 600 U.S. 412, 428 (2023) ("Under the Act, the 'term "use in commerce" means the bona fide use of a mark in the ordinary course of trade,' where the mark serves to 'identify and distinguish [the mark user's] goods ... and to indicate the source of the goods.'") (citing 15 U.S.C. § 1127; alteration in original).

Amici emphasize that services are clearly covered by the Lanham Act, but caution that deeming everything and anything to be a commercial "service" used in the "ordinary course of trade" risks treating political speech the same as commercial speech. *See, e.g.*, *Choose Energy, Inc. v. American Petroleum Institute*, 87 F.Supp.3d 1218, 1221-22 (N.D. Cal. 2015) (holding that defendant's chooseenergy.org, which provided " 'political messaging strategy' that educates voters and encourages them to engage in the political discourse about energy and

to elect officials who support specific energy initiatives" did not offer "services" as defined by the Lanham Act); *International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.*, 914 F.Supp. 651, 656 (D. Me. 1996) (use "in connection with any goods or services" "track[s] closely" the distinction between commercial and noncommercial speech; "indeed, it seems fair to infer that the statutory language limiting the application of these rights to uses 'in connection with any goods or services' serves the purpose of keeping most applications of these rights within the realm of 'commercial speech,' though acknowledging "that it is possible for the unauthorized use of a mark to be, at once, 'commercial' in the statutory sense and 'noncommercial' in the constitutional sense"), *aff'd on other grounds*, 103 F.3d 196 (1st Cir. 1996).

Some courts reason that a noncommercial speaker only provides Lanham Act "services" if it is in direct competition with the trademark claimant and thus truly capable of diverting consumers and substituting for demand for the claimant's services. *See, e.g., Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 323 (4th Cir. 2015) ("if an actual sale of goods is not involved, the infringer must be engaged in some form of commercial competition"); *Wash. State Republican Party v. Wash. State Grange*, 676 F.3d 784, 795 (9th Cir. 2012) ("At minimum, however, the plaintiff must show that the defendant offers competing services to the public.") (cleaned up); *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 679 (9th Cir.

2005) (in assessing whether the Lanham Act can apply to noncommercial speech, "the appropriate inquiry is whether [Defendant] offers competing services to the public"); *Utah Republican Party v. Herbert*, 141 F.Supp.3d 1195, 1204 (D. Utah 2015) (same; "Unless there is a competing good or service labeled or associated with the plaintiff's trademark, the concerns of the Lanham Act are not invoked.").

This practice is, implicitly, a method of tailoring the Lanham Act more narrowly in noncommercial contexts, and it is one mechanism with which to do so. (But, as discussed *infra*, it is insufficient on its own to protect political speech.) The core evil of the Lanham Act—consumer source confusion—can be caused by the names of entities. *See Jack Daniel's*, 599 U.S. at 154-55 (distinguishing cases involving titles and other references from cases involving entity names, including *United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86, 93 (1997)). Nonetheless, while Lanham Act liability is often broad for commercial speech, imposing liability on political speech requires careful attention to the specific accused acts. For example, while ordinary Lanham Act cases can allow one family member to enjoin another's use of the family name in a competing business, *e.g.*, *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992), it would be a serious incursion on the political process to prevent Robert Kennedy, Jr. from using his famous-by-inheritance name in politics. (This example also suggests how small differences can be highly significant in political speech.)

Thus, the Court must attend to what speech actually "indicates the source" of the parties' goods or services in commerce. As *Abitron* made clear, only bona fide use of a mark as a source indicator is within the scope of the Lanham Act; other uses are simply not. 600 U.S. at 428; *see also id.* at 423 n.5 ("[T]he [Lanham Act infringement] provisions treat confusion as a means to limit liability to only certain 'bona fide use[s] of a mark in the ordinary course of trade.'" (quoting 15 U.S.C. § 1127)). In the political context, "source indication" could involve deception about who is speaking, but even then a court should ensure that there is a relevant "use in commerce."[3] Even if accused uses might cause some people to be confused about something other than source—such as who best represents true libertarian values—that is not actionable consumer confusion under the Lanham Act. Likewise, uses that make clear that a conflict is ongoing, and identify the side of the conflict that is speaking, cannot cause actionable trademark confusion about the source of goods or services.

This caution is necessary because restrictions on a noncommercial speaker's choice of name can unconstitutionally interfere with the underlying political messages. See *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500,

---

[3] *Renna v. County of Union, N.J.*, 88 F.Supp.3d 310, 323 (D.N.J. 2014), noted that the breadth of the Lanham Act makes it generally inappropriate to resolve political conflicts, whereas a legislature might enact a law targeted at impersonating a government official (or political candidate or party).

510 (D.C. Cir. 2016) (title or name is a "critical" way to identify a political entity; striking down rule prohibiting use of pro-candidate names without candidate's endorsement); *cf. Matal v. Tam*, 582 U.S. 218, 239 (2017) (opinion of four Justices) ("powerful messages can sometimes be conveyed in just a few words," and trademarks therefore implicate the First Amendment); *Cohen v. California,* 403 U.S. 15, 26 (1971) ("[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process."); *New Kids on the Block v. News America Publ'g, Inc*., 971 F.2d 302, 306 (9th Cir. 1992) ("[W]e need not belabor the point that some words, phrases or symbols better convey their intended meanings than others.").

## III. Any Lanham Act Remedies Applied to Noncommercial Political Speech Must Be Narrowly Tailored

Even when restrictions on political speech are justified by a compelling interest—as the prevention of material deception surely is—they must be narrowly tailored. *See, e.g., Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *Brown*, 564 U.S. at 799; *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 474 (6th Cir. 2016). In the Lanham Act context, narrow tailoring has two key components: ensuring that only material misrepresentations are prohibited, and ensuring that speech is suppressed only if more speech is insufficient.

A. Materiality

In general, noncommercial speech cannot be made unlawful merely because it is false, where the speech causes no material harm. *See United States v. Alvarez*, 567 US 709, 723 (2012) ("Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech, absent any evidence that the speech was used to gain a material advantage, it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom.") (plurality).

Avoiding immaterial confusion, including confusion about whether a speaker needs someone else's permission to speak, is not a compelling interest, especially when speakers sincerely believe what they say. *See* Mark A. Lemley & Mark P. McKenna, *Irrelevant Confusion*, 62 Stanford L. Rev. 413 (2010). The evidence that such confusion could actually harm trademark owners is thin even for ordinary commercial speech;[4] it is nonexistent for noncommercial speech. As this Court has already held when it struck down Ohio's laws against campaign-

[4] See, e.g., Rebecca Tushnet, *Gone in Sixty Milliseconds: Trademark Law and Cognitive Science*, 86 TEX. L. REV. 507, 543-44 (2008); Mark P. McKenna, *Testing Modern Trademark Law's Theory Of Harm*, 95 IOWA L. REV. 63, 97-107 (2009).

related falsehoods, restrictions on immaterial falsehoods in political speech fail to satisfy the narrow tailoring requirement. *Susan B. Anthony List*, 814 F.3d at 475. Enjoining confusing political speech without showing of material injury beyond mere confusion itself is a misapplication of the Lanham Act.

B. More Speech Is Favored Over Less

The other key element of narrow tailoring is that speech cannot be suppressed entirely if clarification of the actual speaker through more speech is readily possible. This Court has emphasized that "the First Amendment protects the 'civic duty' to engage in public debate, with a preference for counteracting lies with more accurate information, rather than by restricting lies." *Susan B. Anthony List*, 814 F.3d at 472.

The focus must be on whether audiences are able to tell the difference between speakers. Remedies against noncommercial speech should therefore generally be limited to requiring clear identification of the speaker. This is also consistent with the First Amendment's normative vision of a citizenry that has a reasonable capacity to understand speech. *Cf. Farah v. Esquire Mag.*, 736 F.3d 528, 537 (D.C. Cir. 2013) ("the [defamation] test ... is not whether some actual readers were misled, but whether the hypothetical reasonable reader could be (after time for reflection)").

When a speaker is identifiable, treating audience members as reasonable citizens often means trusting them. In *Pursuing America's Greatness*, for example, the D.C. Circuit invalidated the Federal Election Commission's ban on unauthorized political committees' use of candidates' names in the titles of their websites and social media pages (the only exception provided by the FEC was when the titles unambiguously expressed opposition to the candidate). The court explained that a website or webpage title "is a critical way for committees to attract support and spread their message because it tells users that the website or Facebook page is about the candidate. Without a candidate's name, the title does not provide the same signaling to the audience. Allowing a committee to talk about a candidate in the body of a website is of no use if no one reaches the website." 831 F.3d at 510. As the D.C. Circuit explained, while there could be a compelling interest in avoiding voter confusion, a ban was not the least restrictive means of furthering that interest. The court noted that "The Supreme Court regularly views such disclosure requirements as less restrictive alternatives to 'flat bans' on speech." *Id.* at 510 (citing *McCutcheon v. FEC*, 572 U.S. 185 (2014) (plurality opinion), and *Citizens United v. FEC*, 558 U.S. 310, 369 (2010). Without evidence that larger or differently worded disclosures would be ineffective, the ban could not stand. *Pursuing America's Greatness*, 831 F.3d at 511 (explaining that "more than anecdote and supposition" was required) (citing *United States v. Playboy*

*Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden[.]")).

*Alliance for Good Government v. Coalition for Better Government*, 998 F.3d 661 (5th Cir. 2021), offers another example of a carefully limited remedy in a political speech case, even in the face of facts indicating significant bad faith (the deliberate copying of the plaintiff's longstanding logo).







Despite this deceptive copying of the plaintiff's logo, the court of appeals modified the district court's injunction to restrain only defendant's use of the logo plus the words Coalition for Better Government, and not the words Coalition for Better Government alone. *Id.* at 663-64.

Similarly, any injunction in this case, to be consistent with the full protection of the First Amendment, must allow uses that clarify the nature of the parties' dispute.

## CONCLUSION

In reaching its decision, this Court should ensure that the commercial core of the Lanham Act is not extended to the noncommercial periphery unless that extension satisfies strict scrutiny.

Respectfully submitted,

*/s/ Rebecca Tushnet*

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae

# APPENDIX A

Barton Beebe, John M. Desmarais Professor of Intellectual Property Law, NYU Law

Stacey Dogan, Professor of Law, Boston University School of Law

Dave Fagundes, Baker Botts LLP Professor of Law, University of Houston Law Center

Mark Lemley, William H. Neukom Professor, Stanford Law School

Yvette Joy Liebesman, Professor of Law, Saint Louis University School of Law

Jessica Silbey, Professor of Law, Boston University School of Law

Rebecca Tushnet, Frank Stanton Professor of the First Amendment, Harvard Law School

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)—which set the limitation for an amicus brief at one half of the maximum length authorized for a party's principal brief (i.e., 6,500 words)—because, excluding the parts of the brief exempted by Federal Rule 32(f), the brief contains 2822 words on the basis of a count made by the word processing system used to prepare the brief (and adding ten words for the words displayed in the images).

Pursuant to Federal Rules of Appellate Procedure 32(a)(5) and 6, I hereby certify that this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Respectfully submitted,

*/s/ Rebecca Tushnet*

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2023, a copy of the foregoing is being filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Rebecca Tushnet*

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae