No. 23-1856

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

LIBERTARIAN NATIONAL COMMITTEE, INC.,

*Plaintiff-Appellee,*

v.

MICHAEL J. SALIBA, *et al.*,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division
Case No. 23-cv-11074
The Honorable Judith E. Levy, District Judge

_____

BRIEF OF PLAINTIFF - APPELLEE

Joseph J Zito
DNL ZITO CASTELLANO
1250 Connecticut Avenue, NW
Suite 700
Washington, DC 20036
(202) 466-3500
jzito@dnlzito.com

Attorneys for *Plaintiff-Appellee*

DISCLOSURE STATEMENT

The Libertarian National Committee, Inc. is not a subsidiary or affiliate of a publicly owned corporation.  There are no publicly owned corporations, not a party to the appeal, that have a financial interest in the outcome.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT IN SUPPORT OF ORAL ARGUMENT . . . . . . . . . . . . . . . viii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   EVENTS AND GOVERNANCE WITHIN THE
      LIBERTARIAN PARTY OF MICHIGAN AND THE
      NATIONAL LIBERTARIAN PARTY . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  RELEVANT DISTRICT COURT PROCEEDINGS
      AND ENFORCEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.    PRELIMINARY INJUNCTION STANDARD . . . . . . . . . . . . . . . . . . . 16

VI.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A.    The District Court Correctly Issued
            a Narrowly Tailored Injunction
            Under the Lanham Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      B.    Lanham Act Protection is not Confined
            to For-Profit Enterprises . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      C.    The Lanham Act Protection for Non-Profit
            Enterprises Necessarily Includes Political
            Organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**VI.**   **THE AMICUS BRIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

**VII.**   **APPELLANTS' RELIANCE ON** *TAUBMAN*
**IS MISPLACED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

      **A.**   **False Designation of Origin and Affiliation
is not Mere Criticism and is not Protected
Speech Under the First Amendment** . . . . . . . . . . . . . . . . . . . . . . . **35**

**VIII.**   **THE DISTRICT COURT PROPERLY REFRAINED
FROM INTERFERING IN THE GOVERNANCE
OF A POLITICAL PARTY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

      **A.**   **A Non-Licensed Group Cannot Claim a
License for Purpose of Impersonating the
Valid License Holder** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

      **B.**   **Appellants' Arguments Entail that any
Alleged Governance Dispute is Irrelevant** . . . . . . . . . . . . . . . . . . **38**

**IX.**   **THE DISTRICT COURT PROPERLY BALANCED
EQUITABLE FACTORS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

      **A.**   **The State and the Public have an Interest in
the Orderly Identification of Officially
Recognized Political Parties and Political
Action Committees** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

      **B.**   **Abolishing Protection for the Identity of
Political and Public Policy Advocacy Groups
would be Potentially Disastrous** . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

**X.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **44**

# TABLE OF AUTHORITIES

**15 U.S.C. § 1114(1)(a)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12, 18, 19**

**15 U.S.C. § 1125(a)(1).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

**15 U.S.C. §§1051 et eq** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iv, 21**

**18 U.S.C. §1341;** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

**28 U.S.C. § 1292,** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iv**

**28 U.S.C. § 1331,** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iv**

**52 U.S.C. §30124** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

**599 U.S. 140, 153 (2023)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

***Alliance for Good Government v. Coalition for Better Government***, 998 F.3d 661
**(5th Cir. 2021)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25, 26, 27**

***American Diabetes Ass'n, Inc. v. Nat'l Diabetes Ass'n***, 533 F. Supp. 16, 20 (E.D.
**Pa. 1981)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

***AWGI, LLC v. Atlas Trucking Co., LLC***, 998 F.3d 258,
**264 (6th Cir. 2021).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12, 18**

***Bays v. City of Fairborn***, 668 F.3d 814, 818–19 (6th Cir. 2012)) . . . . . . . . . . . **40**

***Bosley Med. Inst., Inc. v. Kremer***, 403 F.3d 672, 674
**(9th Cir. 2005).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19,20,23,32**

***Brach Van Houten Holding, Inc. v. Save Brach's***
***Coalition For Chicago***, 856 F. Supp. 472, 475-76 (N.D. Ill. 1994). . . . . . . . . . **33**

***Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.***,
511 F.3d 535, 542 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

*Chi Mercantile Exch. Inc. v. Ice Clear US, Inc.*
2021 WL 3630091, at *13 (N.D. Ill. Aug. 17, 2021);  . . . . . . . . . . . . . . . . . . . . . 36

**Comerica Bank later filed an interpleader action in
Michigan state court (Case No. 23-000557-CB,
Washtenaw County Circuit Court)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Committee for Idaho's High Desert v. Yost*, 881 F. Supp. 1457,
1470-71 (D. Idaho 1995), aff'd, 92 F.3d 814 (9th Cir. 1996) . . . . . . . . . . . . . . 34

*Cousins v. Wigoda*, 419 US 477 (1975), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Democratic Party of United States v. Wisconsin ex rel. La Follette*,
450 U.S. 107, 122 (1981). *Buckley v. Valeo*, 424 U.S. 1 at 15  (1976) . . . . . . . . 25

*Dial-A-Mattress Operating Corp. v. Mattress, Inc.*, 847 F. Supp.
18, 19 n.1 (E.D.N.Y 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d at 201 [141 F.3d 188] . . . 27

*Graveline v. Johnson*, 747 F. Appx. 408, 412 (6th Cir. 2018) . . . . . . . . . . . . . 40

*Hudson Gas & Elec. Corp. v. Public Service Commission
of New York*, 447 U.S. 557, 561 (1980)), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Hudson Gas Elec. Corp. v. Public Serv. Comm'n of New York*,
(457 U.S. 557, 563, 100 S. Ct. 2343, 65 L.Ed. 341 (1980), . . . . . . . . . . . . . . . . 18

*Jack Daniel's Properties, Inc. v. VIP Products LLC*, . . . . . . . . . . . . . . . . . . . . .

**Jacobs, Jonathan M., "Pascal's Wager and the Continuing
Breach."** *Parliamentary Journal* 64, No. 2 (August 2023), 20-27 . . . . . . . . . . . 4

*Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity*,
654 F. Supp. 1095, 1101 (D.N.H. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 730
(3rd Cir. 2004), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005), . . . . . . . . . . . . . 19, 20

**Lanham Act (Sections 32 and 43(a),** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

**Lanham Act, 15 U.S.C. § 1051,** *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iv**

 *Little Caesar Enterprises, Inc. v. R-J-L Foods, Inc.,*
*796 F. Supp. 1026, 1036 (E.D. Mich. 1992)* . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Lorrillard v. Amouri*, 453 F.3d 377 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 43

*Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 [ 91 S.Ct. 621, 625, 28 L.Ed.2d
35] (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*N.A.A.C.P. v. N.A.A.C.P. Legal Defense and Educ. Fund*, 559 F. Supp. 1337,
1342 (D.D.C. 1983), rev'd on other grounds, 753 2.d 131 (D.C. Cir.), cert.
denied , 472 U.S. 1021 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*NAACP v. Alabama*, 357 U.S. 449, 460 [ 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488]
(1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*O'Brien v. Brown*, 409 U.S. 1, 4 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 195 (3d Cir.
1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Opticians Ass'n*, 920 F.2d at 198. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 197
(3d Cir. 1990); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Planned Parenthood Fed'n of Amer. Inc. v. Bucci,*
No. 976 Civ. 0629, 1997 WL 133313 (S.D.N.Y. March 24, 1997),
aff'd, No. 97-7492, 1998 WL 336163 *4 (2nd Cir. Feb. 9, 1998). . . . . . . . . 21, 22

*Radiance Found, Inc. v. NAACP*, 786 F.3d 316, 323 (4th Cir. 2015) . . . . . . . . 26

*Republican National Committee v. Canegata et. al.,*

No. 3:22-cv-0037 (V.I., St. Thomas and St. John Div.) . . . . . . . . . . . . . . . . . . . . **34**

*S&R Corp. v. Jiffy Lube Intern., Inc*., 968 F.2d 371, 379
**(3rd Cir. 1992).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

*Slattery v. Madiol*, 257 Mich. App. 242, 250, 668 NW2d 154 (2003) . . . . . . . . **38**

*Taubman Co. v. Webfeats,* 319 F.3d 770 (6th Cir. 2003) . . . . . . . . . . . . . . . **29, 31**

*Taubman v. Webfeats*, 319 F.3d 770, 774, 775 (6th Cir. 2003) . . . . . . . . . . . . . **18**

*Tomei v. Finley*, 512 F. Supp. 695, 698 (N.D. Ill. 1981) . . . . . . . . . . . . . . . . . . **24**

*U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 142-43 (3d Cir. 1981), . . . . . . . . **34**

*U.S. v. Edward Rose Sons*, 384 F.3d 258, 261 (6th Cir. 2004). . . . . . . . . . . . . . **40**

*United States Jaycees v. Philadelphia Jaycees*,
**490 F. Supp. 688, 691 (E.D. Pa. 1980)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

*United States Jaycees v. San Francisco Junior*
*Chamber of Commerce*, 354 F. Supp. 61, 64, 65 (N.D. Cal. 1972). . . . . . . . . . . **33**

*United We Stand Am., Inc. v. United We Stand,  Am.*
*New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . **12, 18, 19**

*Utah Republican Party v. Herbert*,
**141 F. Supp. 3d 1195, 1204 (D. Utah 2015)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

*Washington State Republican Party v.*
*Washington State Grange*, 676 F.3D 784, 795 (9th Cir. 2012) . . . . . . . . **11, 12, 18**

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Appellee, Pursuant to Federal Rule of Appellate Procedure 34 and Sixth Circuit Rule 34(a), request oral argument on the instant appeal.

This matter is not an issue of first impression, this Court has long recognized that Trademark law prevents individual, groups and companies from stealing the identity of others to create a false impression.  It is fundamental trademark law that restricts Defendants/Appellants from pretending to be the Plaintiff/Appellee. However, Appellants have mischaracterized this case as a struggle between Trademark Law and political free speech, which it is not.  Thus oral argument may aid in clearing Appellants' attempted confusion.

**JURISDICTIONAL STATEMENT**

The District Court has jurisdiction over Plaintiff's complaint pursuant to 28 U.S.C. § 1331, as this case involves the application of a federal statute, the Lanham Act, 15 U.S.C. § 1051, *et seq.*

This Court has appellate jurisdiction under 28 U.S.C. § 1292, as Defendants appeal from an interlocutory order of the District Court entered on August 24, 2023, granting Plaintiff's Motion for a Preliminary Injunction. Prelim. Inj., DE 21, Page ID # 1134. The Defendants timely filed and electronically served their Notice of Appeal on September 19, 2023. Notice of Appeal, DE 24, Page ID # 1166.

**STATEMENT OF THE ISSUES**

1.    Does the Lanham Act allow a political organization with a registered trademark to prevent imposter groups from pretending to be that political organization or representing themselves as the real political organization?

      Yes.

2.    Does the District Court's limited injunction strike the proper balance between preventing Appellants from impersonation of the Libertarian Party of Michigan, including filing official documents in furtherance of such impersonation, while allowing Appellants to: (i) form their own organization if they wish, (ii) freely criticize the National and State affiliate Libertarian Party organizations, (iii) support and solicit donations on behalf of any candidate or issue of their choice, and (iv) advocate for political issues like any other member of the party or general public?

      Yes.

3.    Does protection of a political organization's core identity through trademark law strike the proper balance between avoiding voter confusion or deception in furtherance of a free and fair electoral process and allowing for both free speech and freedom of association?

      Yes.

4.      Would abolishing trademark protection for political and public policy

advocacy organizations foster widespread voter confusion and promote political

mischief and sabotage?

       Yes.


5.      Is allowing anyone to present themselves as the leadership of a federal

and/or state recognized political party, regardless of actual authority, in the public

interest?

       No.


6.      Can a non-licensed group claim to have a trademark license for the purpose

of impersonation of the genuine affiliated group?

       No.


7.      Was a claim to leadership which has already been settled within the internal

processes of a political organization and for which disputants did not exhaust their

internal appeal remedies properly left out of consideration in granting an

injunction?

       Yes.

**Appellee's Response to Appellants' Statement of Issues**

1. Whether the Lanham Act extends to non-commercial political speech like soliciting political donations, filing campaign-finance paperwork, and disseminating political articles and information, including criticism of fellow party members.

Answer, Yes.  All of those activities are freely allowed under the Lanham Act so long as the actor does not falsely represent themselves as the political party.

2. Whether, to obtain injunctive relief for trademark-infringement, a trademark holder must adduce sufficient facts to show that it properly terminated any license that it previously granted to the Defendants.

Answer, Yes.  However, Defendants had no license thus no termination was needed.

3. Whether the equities favor the District Court's sweeping injunction, which prohibits the Defendants from using the name of the political party to which they undisputedly belong.

Answer, No such sweeping injunction was issued. The injunction in no

manner prohibits the use of the words Libertarian Party and fully allows

Defendants to state that they are members of the Libertarian Party and/or the

Libertarian Party of Michigan.  The Injunction is properly limited to preventing

Defendants from representing themselves *as* the Libertarian Party.  They are

members, they are not the organization.   See ECF No. 32 Page ID.1241:

"Defendants are free to identify as Libertarians and voice their political opinions

but may not engage in trademark infringement."

## STATEMENT OF THE CASE

## I.    INTRODUCTION

This is a straightforward and narrowly constructed case of trademark infringement.  It does not involve protected free speech. The injunction, as issued, prevents blatant impersonation of an organization holding an incontestable trademark.  See ECF No. 32 Page ID.1241:

> "Defendants are free to identify as Libertarians and voice their political opinions but may not engage in trademark infringement."

To the extent that the First Amendment is involved in this case, it is on the side of Appellee's right to freedom of political association and to the rights of private political parties to their own internal governance procedures free from government interference.  The District Court narrowly and properly enjoined Appellants from falsely identifying themselves as, and acting as, the Plaintiff trademark holder and explicitly did not enjoin free speech.

Appellants' introduction misstates operative facts.  Appellants are not the Libertarian Party of Michigan.  Appellants are members of the Libertarian Party of Michigan.  Appellants may believe themselves to have won an election, however, under the rules of the State party, and as recognized by the National Libertarian Party, the trademark holder, they did not.  The National Libertarian Party allows

recognized affiliates to use the Libertarian Party trademark.  This internal dispute

over leadership was resolved according to the bylaws of the LPMI. Appellants did

not petition the Judicial Committee of the NLP for further review, they simply

decided to unilaterally hold themselves out to the public as The Libertarian Party

of Michigan and forgo any opportunity for review. This is not an issue of free

speech.   Appellants are free to express their political views, external and internal.

This is a trademark infringement matter, i.e. impersonating another by public use

of a trademark.

Most of Appellant's Brief is a discussion of internal politics not relevant to

any issue on appeal.  Appellants' professed belief that they won an internal election

is not germane to any issues in this case.

## II.    EVENTS AND GOVERNANCE WITHIN THE LIBERTARIAN PARTY OF MICHIGAN AND THE NATIONAL LIBERTARIAN PARTY

The blow-by-blow details of internal disputes, personality conflicts, and

competing caucuses within the Libertarian Party of Michigan (LPMI) and the

national Libertarian Party (NLP) are not germane to the issues at hand, and within

political parties, are inevitable.   In politics, there are winners, and there are losers.

The LPMI and the NLP are governed by rules and bylaws [LPMI bylaws, DE 12-

28, PAGEID# 516-526 and NLP bylaws, DE 12-7, PAGEID# 451-457] both of

-2-

which contain a designation of Robert's Rules of Order, Newly Revised,12[th] Edition, (RONR 12th ed.) as their parliamentary authority [LPMI bylaws, DE 12-28, PAGEID# 524 and NLP bylaws, DE 12-7, PAGEID# 460]. Rights of members contained within the fundamental principles of parliamentary law and provisions in the bylaws cannot be violated, even with a unanimous vote, without going through the formal process of amending the bylaws (RONR 12th ed. 25:9, 56:68(1)). Bylaws must first be ambiguous before there is a need for an interpretation of their intent (*Id*. at 56:68(1)). Violations that are continuing breaches of the bylaws or of member rights that are in violation of fundamental principles of parliamentary law are null and void for as long as they remain in continuing force and effect (*Id*. at 23:60). These would include rules protecting absentees, such as rules requiring proper notice of certain actions (*Id*. at 23:6(e)).

On or about July 9, 2022, the LPMI held a candidate nominating convention at which the LPMI Chair, Andrew Chadderdon, was purportedly removed from office and certain other internal Executive Committee vacancies were filled. Mr. Chadderdon ruled the consideration of these items out of order as violating the LPMI's bylaws and its parliamentary authority, specifically, that proper notice was not given of these items of business which would violate the rights of absentees

-3-

and render any such actions null and void.[1]  Despite that ruling, the delegates in

attendance decided to overturn the ruling of the Chair in violation of their own

bylaws and pass those items of business. Mr. Chadderdon consistently maintained

that he would be filing an appeal with the LPMI Judicial Committee which has the

ultimate authority under the LPMI bylaws to make determinations on allegations of

violations of the LPMI bylaws,[2] but would wait until after the November election

so as not to be disruptive to the campaigns of the LPMI candidates.

On or about November 18, 2022, Mr. Chadderdon filed an appeal with the

LPMI Judicial Committee [Appeal of Andrew Chadderdon, DE 17-28. PAGEID#

---

[1] It is relevant to note that due to the late timing of Appellants' decision to hear such items of business, it was impossible to give minimum notice for this particular convention; however, they could have petitioned for a special convention, or they could have properly noticed these items for a future Executive Committee meeting.  Knowing the risk that proceeding forward could cause a continuing breach of the LPMI bylaws, Appellants chose to take that course of action rather than taking the time to ensure there was no chance of such a breach. Since the time of the injunction, this very topic was covered in a parliamentary journal (Jacobs, Jonathan M., "Pascal's Wager and the Continuing Breach." *Parliamentary Journal* 64, No. 2 (August 2023), 20-27).

[2] **V. JUDICIAL COMMITTEE**
1. The judicial power of the Party shall be vested in a Judicial Committee composed of three Party members. All of these committee members shall be elected to a two-year term at a regular convention of the Party by the attending delegates and shall take office immediately upon the close of such convention and shall serve until the final adjournment of the next regular convention. **No member of the Executive Committee may be a member of the Judicial Committee. 2. The Judicial Committee shall decide cases involving alleged violations of these bylaws or resolutions.** [emphasis added in all but bylaws title] [LPMI Bylaws, DE 12-28, PAGEID# 520-521]

-4-

1082-1094] and submitted the opinion of Jonathan M. Jacobs, PRP, CPP, in

support of the assertions of nullity due to invalid notice [Parliamentary Opinion,

DE 17-8, PAGEID# 950-952].  On or about December 13, 2022, the LPMI Judicial

Committee ruled in Mr. Chadderdon's favor which rendered the actions of the July

9, 2022, nominating convention in removing Mr. Chadderdon from the

chairmanship and filling vacancies on the Executive Committee null and void,

resulting in the reversion of the composition of the LPMI Executive Committee as

it existed on July 8, 2022, including the reinstatement of Mr. Chadderdon as LPMI

Chair [LPMI Judicial Committee Decision, DE 12-29, PAGEID# 527-539].

Plaintiff/Appellee had no part in this internal activity of the LPMI.

After being notified of the decision of the LPMI Judicial Committee to

recognize Mr. Chadderon as the LPMI Chair, Plaintiff/Appellee, the Libertarian

National Committee (LNC) recognized the leadership of the LPMI as determined

by the autonomous processes under the LPMI bylaws, as required by the NLP

bylaws. which requirements were affirmed by the most recent relevant decision of

the NLP's own Judicial Committee [National Judicial Committee Decision, DE 17-

5, PAGEID# 860-874].  **At no time was any disaffiliation of the LPMI required,**

**as the LPMI that presently exists is the same LPMI that has existed**

**continuously since 1972**.  A change in leadership is a regular occurrence under all

of the LNC's affiliate's bylaws and does not substitute one organization for another.   Recognition of these changes is routine and required by the LNC bylaws [Second Declaration of Caryn Ann Harlos, DE 17-4, PAGEID# 846-848].

The Appellants' Brief ignores some important events which occurred prior to the filing of the law suit.  Appellants, being unhappy with the decision of the LPMI Judicial Committee, properly submitted a member petition in early January 2023 for a special convention to consider the removal of Mr. Chadderdon with the required prior notice among other items of business [Petition for Special Convention, DE 17-13, PAGEID# 969-1044].  The LPMI Executive Committee set that special convention for April 1, 2023, in Wixom, Michigan.  Several of the Appellants, still being valid Executive Committee members, participated in the meetings of the Executive Committee of the LPMI up through the end of January 2023, including the meetings at which the special convention was discussed and planned [LPMI Meeting Minutes dated January 6, 2023, DE 17-12, PAGEID# 967-968 and LPMI Meeting Minutes dated January 25, 2023, DE 12-30, PAGEID# 540-553].  Suddenly and secretly, Appellants decided[3] that the Judicial Committee decision was merely advisory [Emails, RE 16-9, PAGEID# 713-714] and

---

[3] The LPMI bylaws passed by the LPMI membership created an empowered Judicial Committee which unambiguously had the final authority to **decide** on matters of bylaws violations, not merely **advise** (see footnote #2 *supra)*, no one could simply legitimately ignore its rulings.

proceeded to declare themselves the legitimate Executive Committee of the LPMI,

setting up a competitive rival imposter organization using the incontestable,

federally registered LIBERTARIAN PARTY trademark (the "Trademark") of the

LNC.   Rather than informing the rest of the Executive Committee of their "new

realization," and less than a week after voting to add Mr. Chadderdon as a

signatory on the LPMI bank account containing approximately $40,000.00 [LPMI

Meeting Minutes dated January 25, 2023, DE 12-30, PAGEID# 552], Appellant

Brungardt declared himself the Chair of the LPMI and did not add Mr. Chadderdon

to the Party bank account, thus effectively seizing the monetary assets of the

LPMI.[4]  In addition, Appellants attempted to claim ownership of the LPMI's

corporate identity with the Michigan Licensing and Regulatory Agency (LARA)

[LARA filing, DE 12-16, PAGEID# 494-496], state political committee identity

with the Michigan Bureau of Elections (MBE) [MBE website print-out, DE 12-12,

PAGEID# 478 and Additional Evidence of Confusion, DE 20-1, PAGEID# 1128-

1133], and federal political committee identity with the Federal Elections

Commission (FEC) [FEC Filings, DE 12-13, PAGEID# 479-487], actions which

---

[4] Comerica Bank later filed an interpleader action in Michigan state court (Case
No. 23-000557-CB, Washtenaw County Circuit Court) which is presently stayed
pending the outcome of this appeal.  These actions have deprived the Libertarian
Party of Michigan of its operating funds and thus Appellee of its interest in its
affiliates ability to fund their political operations.

-7-

could negatively impact the LNC in its delivery of political services such as putting its presidential and vice-presidential candidates on the ballot in Michigan.[5]  Rather than waiting to put the matters of the removal of Mr. Chadderdon and the filling of Executive Committee vacancies before the members in the validly called special election **which Appellants themselves demanded**, Appellants called a regular convention to occur in a different town on the exact same day, with no bylaws authority to do so.   Appellants sent their notification email exactly one day after the recognized LPMI emailed out its notice for the special convention demanded by Appellants. [Email dated January 30, 2023, DE 12-31, PAGEID# 554-555 and Email dated January 31, 2023, DE 12-32, PAGEID# 556-557].[6]

In response to these actions, Appellee voted to send a cease and desist letter regarding Appellants misrepresenting themselves as the recognized Libertarian Party of Michigan.  [LNC Email Ballot, DE 17-21, PAGEID# 1066 and LNC

---

[5] The recognized Michigan affiliate is presently listed with these entities but there is no doubt that absent the injunction, Appellants would once again engage in a "paper filing battle" at cost of time and money to correct.  LARA in particular simply takes any filing on its face and control is given in a ping-pong fashion to whoever has the most current filing, and anyone who has several hundred dollars to spend on multiple expedited filings, is effectively given corporate recognition, legitimate or not.  This behavior is presently ceased due to the District Court injunction.

[6] A later email for this illegitimate convention was sent spoofing the domain of the legitimate Libertarian Party of Michigan website michiganlp.org [Spoofed email, DE 12-18, PAGEID# 498-499].

Cease and Desist Letter, DE 12-10, PAGEID# 474-476].  The Appellants have

consistently chosen to misrepresent  Appellee's cease and desist letter and the

subsequent legal action to claim that Appellee was demanding that absolutely *any*

*use* of the phrase "Libertarian Party" in *any context* was forbidden when it is clear

that the issue in dispute was Appellants claiming to **be and acting as the Party**

and not speaking or conducting activities **about the Party** or engaging in political

activism.

Even after all of these events, including refusing to attend the special

convention on April 1, 2023 that they demanded in order to properly consider the

removal of Mr. Chadderdon, Appellants could have still legitimately retaken the

leadership of the LPMI and put an end to all these issues merely by attending the

subsequent regularly called legitimate convention of the LPMI on July 15, 2023

at which point any of their desired actions could have been properly voted upon by

the LPMI membership, completely in line with their bylaws, rendering this

litigation moot.  Appellants could also have appealed the actions of Appellee under

the NLP bylaws [Emails, DE 17-23, PAGEID# 1074-1077] which they never

attempted.  Thus, there were at least three indisputably legitimate off-ramps to this

whole matter of which Appellants were fully aware but chose to disregard, instead

opting to continue its impersonation of the officially recognized affiliate and

causing irreparable harm.

## III.   RELEVANT DISTRICT COURT PROCEEDINGS AND ENFORCEMENT

On or about May 5, 2023, the LNC filed a Complaint for trademark infringement under the Lanham Act against Appellants for misuse of the LNC's Libertarian Party Trademark .  Infringement under the Lanham Act is necessarily limited to use of a mark "in commerce . . . in connection with . . . distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive" (15 USC §1114) and not merely uttering or writing the mark, and in particular, not simply speaking the mark in critical commentary or in individual political activism [Complaint, DE 1, PAGEID# 1-19].  On or about June 15, 2023, the LNC moved for a preliminary injunction similarly seeking enjoinment, again not of using the Trademark in general political discourse (no matter how critical) or activity, but of use in false designation of origin or affiliation in conjunction with the provision of goods or services [Motion for Preliminary Injunction, DE 12, PAGEID# 373-424] which was granted on August 23, 2023 [Preliminary Injunction Order, DE 21, PAGEID# 1134-1135 and Hearing Transcript, DE 22, PAGEID# 1136-1164].

The District Court soundly rejected any argument that the Lanham Act did not apply to political/non-profit organizations, stating "in no uncertain terms that

-10-

offering services as a political party counts as operating 'in commerce'" (citing

*Washington State Republican Party v. Washington State Grange*, 676 F.3D 784,

795 (9th Cir. 2012)[7] and found that it was not the place of the District Court to

interpret the bylaws of the NLP, particularly as no breach of contract counterclaim

had been brought [Hearing Transcript, DE 22, PAGEID# 1142  and 1145].  The

District Court correctly found that **all** of the factors to be considered in granting a

preliminary injunction weighed decisively in the LNC's favor.

On or about September 19, 2023, the Defendants filed a Motion to Stay

which, at best, demonstrated confusion about the scope of the Court's prior

injunction [Motion to Stay, DE 25, PAGEID# 1168-1177].   Subsequently, on or

about October 13, 2023, the Court denied the Defendants' Motion to Stay with

crystal clarity about the limited scope of the injunction [Order, DE 32, PAGEID#

1235-1242]. In Appellants' statement that the District Court ruled that the

Defendants did not demonstrate irreparable harm in their Motion to Stay because

they could still "identify as Libertarians" [Appellants Brief, page 23], Appellants

---

[7] It is worth noting that the Libertarian Party of Washington was a party to this case
alleging trademark violation against the state of Washington, which was denied by
the Court, based not upon the inapplicability of trademark protection in the context
of political parties, but upon the finding that Washington was not offering
competing goods or services by using the Libertarian Party Trademark on their
ballot. Thus, the affirmation of the *Washington State Grange* court that political
party services are services "in commerce"  covered under the Lanham Act was
**directly referring to the exact Trademark that is at issue here**, that of the LNC.

disprove their own claim that the District Court issued a "sweeping injunction which prohibits the Defendants from using the name of the political party to which they undisputably [sic] belong" [Appellants' Brief, page 10]. In the Defendants' Motion to Stay, they asserted that they "cannot identify as members of the Libertarian Party" and that "[c]ore to this litigation is the right to identify as a 'Libertarian.'" The District Court went out of its way in its Order Denying Defendants' Motion to Stay, to contradict the assertions of the Defendants, by stating that:

> "in order for infringement to occur, the infringer must 'use [] the mark in commerce without authorization' *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 264 (6th Cir. 2021). The core of this case is Defendants' alleged unauthorized use of the Libertarian Trademark 'in connection with the sale, offering for sale, distribution, or advertising of any good or services' 15 U.S.C. § 1114(1)(a). These services 'can include activities performed by a political party.' *Washington State Republican Party v. Washington State Grange*, 676 F.3d 784, 795 (9th Cir. 2012), such as operating a website that utilizes the Trademark and solicits donations. (ECF No. 22, PageID.1158.) *See United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997). Defendants are free to identify as Libertarians and voice their political opinions but may not engage in trademark
>
> infringement. Order Denying Stay, DE 32, PAGEID# 1240-1241].

The District Court record could not be clearer that only identifying and acting **as** the Libertarian Party affiliate and solicitation of donations as the Libertarian Party affiliate were enjoined, **not** criticism, candidate advocacy or

-12-

opposition, or political commentary on libertarian issues as Libertarians and certainly not what the Defendants represented to the District Court as the "core to this litigation...the right to identify as Libertarians."

Contrary to Appellants' intentional mischaracterization of the injunction as sweeping, the Appellee is in complete agreement about the limited scope of the injunction as stated by the District Court. This is evidenced by the fact that numerous social media postings and websites of Appellants opposing and criticizing the LNC, including fundraising activities, remain visible and unchallenged (including the ones referenced by Appellants in their brief [Appellants' Brief, page 10] as evidence that the LNC was attempting to silence their criticism) which demonstrates the exact opposite, that the LNC has made no attempt to silence the Appellants. In fact, Appellant Saliba is presently running as a Libertarian Party candidate for Congress[8] nominated by a legitimate county affiliate with no attempts to prohibit this activity by the LNC. There is simply no "sweeping injunction."

If Appellants genuinely believe that this is the actual "sweeping" scope of the injunction, then they have contumaciously and continuously disregarded the injunction from the moment it was issued, by their own admissions, by fundraising

---

[8] See https://www.facebook.com/ElectMikeSaliba/

to oppose the national Libertarian Party/LNC, promoting websites critical of the national Libertarian Party, LNC, and the recognized Michigan affiliate, identifying as Libertarian Party members, running for internal office within the national Libertarian Party and for public office as Libertarian Party candidate(s), and providing commentary about the dispute to the media, at a minimum.  For example, a recent social media post by Appellant Saliba uses the very words: "I am a member of the Libertarian Party of Michigan" and stating his political opinions on convention results in critical contradiction to the position of the LNC.

This post remains visible and has not been the subject of any request by Appellee for removal. In fact, Appellants make no factual reference to any action or example of Appellee which is even asserted to have been an actual limitation of free speech.  The actions of Appellants belie their assertions that such statements were sought to be, and actually were, enjoined.  The Appellee's actions support its position that the injunction was strictly limited to impersonation of the recognized Libertarian Party of Michigan by using the Trademark in delivering political party goods and services.  All of the LNC's requests for compliance with the injunction prohibiting infringement, including website language changes and transfer of election filings, were complied with by Appellants, without incident or objection.

-14-

## IV.    SUMMARY OF ARGUMENT

The Court should uphold the District Court's entry of a preliminary injunction and its analysis of the factors supporting its entry of same, which are plain and straightforward.  The Appellants conflate political speech and activities with the narrow confines of trademark violation and want to inappropriately limit trademark protection to for-profit enterprises.  Despite characterizations to the contrary, neither Appellee nor the District Court sought to enjoin Appellants' individual rights to free political speech. What was enjoined was use of the Trademark in commerce to identify the source of Appellants' political services, thereby preventing Appellants from acting, as the District Court so aptly described, as a "knockoff Libertarian Party" [Hearing Transcript, DE 22, PAGEID# 1161]. Appellants further have the public interest backwards. The public is served by accuracy in naming the source of public speech, especially political speech. The public is harmed by confusion, i.e., when two separate entities claim to be the "Libertarian Party of Michigan" especially when both acknowledge that only one of those groups is actually officially recognized by the national Libertarian Party.

This case is also not about which group is the "rightful" LPM or about proper disaffiliation procedures in Appellee's bylaws. This argument is raised by Appellants simply to distract from the fact that an unlicensed group is using the

-15-

LNC's trademark. The LNC owns the Trademark, and thus the LNC has the right to decide who is licensed to use the Trademark within its own governance structure.

Lastly, the conclusory summary statement of Appellants that the District Court's injunction "took sides in an intra-party political dispute" is incoherent. This matter was resolved using the internal bylaws and rules of both the LPMI and the NLP and the District Court recognized that right. It is Appellants who are attempting to circumvent the rights of private political parties and have the courts impose a different outcome.. Appellants had internal remedies available to challenge the decisions of the LNC in line with the NLP bylaws, but Appellants chose to forgo those remedies, and are now inappropriately asking this Court to suspend trademark law inthe 6th Circuit, without recourse, a determination that the District Court rightfully refused to make.

## V.    PRELIMINARY INJUNCTION STANDARD

The Appellee  agrees with the factors outlined by Appellants that are required to be established to obtain injunctive relief, and agrees that the Court's factual findings are reviewed "under a clearly erroneous standard, and its legal conclusions de novo" but absolutely disagrees that the District Court abused its discretion in finding all of these factors decisively satisfied in Appellee's favor or that it relied upon clearly erroneous findings of fact.  In fact, no proffer of clearly

erroneous findings of fact was made in Appellants' Brief and none of the parties requested an evidentiary hearing from the District Court, either for Plaintiff's Motion for Preliminary Injunction or for the Defendants' Motion to Stay Pending Appeal.[9]

## VI.    ARGUMENT

### A.    The District Court Correctly Issued a Narrowly Tailored Injunction under the Lanham Act.

The First Amendment is potentially implicated in all cases under the Lanham Act.  Thus, as noted by the Amici Curiae Brief filed Rebecca Tushnet, Esq. (Tushnet Amici) in this matter, any enforcement must be limited to the preventing the "core evil" of deception about the source of goods and services, *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140, 153 (2023) (use "as a designation of source of the infringer's own goods" is use "in the way the Lanham Act most cares about.") The District Court was careful to confine its rulings to these strictures, *to wit*:

> Defendants claim that they "cannot identify as members of the Libertarian Party without using [the trademark]" and that "[c]ore to this litigation is the right to identify as a 'Libertarian.'" (ECF No. 31, PageID.1230)
>
> **Not so.** The Preliminary Injunction enjoins Defendants from

---

[9] It is noted that they also did not request in evidentiary hearing in this Appeal. Appellee does not believe one is necessary as the record is crystal clear.

infringing on Plaintiff's Trademark. (ECF No. 21.) In order for infringement to occur, the infringer must "use[] the mark in commerce without authorization." *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 264 (6th Cir. 2021). The core of this case is Defendants' alleged unauthorized use of the Libertarian Trademark "in connection with the sale, offering for sale, distribution, or advertising of any good or service." 15 U.S.C. § 1114(1)(a). These services "can include activities performed by a political party," *Washington State Republican Party v. Washington State Grange*, 676 F.3d 784, 795 (9th Cir. 2012), such as operating a website that utilizes the Trademark and solicits donations. (ECF No. 22, PageID.1158.) See *United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997). **Defendants are free to identify as Libertarians and voice their political opinions but may not engage in trademark infringement.**

[Order, ED 32, PAGEID# 1240-1241]

Further, the Lanham Act should be examined with intermediate scrutiny as it only regulates "commercial speech" which, contrary to Appellants' assertions, is **not** limited to for-profit endeavors, but is available to all enterprises involved with activities "in connection with the sale, offering for sale, distribution, or advertising of any good or service" which is not the same as mere commentary or criticism. (see *Taubman v. Webfeats*, 319 F.3d 770, 774, 775 (6th Cir. 2003) citing *Hudson Gas Elec. Corp. v. Public Serv. Comm'n of New York,* (457 U.S. 557, 563, 100 S. Ct. 2343, 65 L.Ed. 341 (1980), stating that regulation of commercial speech is subject only to intermediate scrutiny and that if [Defendant's] use is both

-18-

commercial and confusing, it is "outside the First Amendment.") For

instance, in *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005),

involving a website highly critical of the Reverend Jerry Falwell's positions

on public policy and morality, the court stated:

> [Defendant and Amici] argue at length that application of the
> Lanham Act must be restricted to "commercial speech" to
> assure that trademark law does not become a tool for
> unconstitutional censorship. The Sixth Circuit has endorsed this
> view, see *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir.
> 2003), and the Ninth Circuit recently has done so as well, see
> *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 674 (9th Cir.
> 2005). **In contrast, the trademark infringement and false**
> **designation of origin provisions of the Lanham Act**
> **(Sections 32 and 43(a), respectively) do not employ the term**
> **"noncommercial." They do state, however, that they pertain**
> **only to the use of a mark "in connection with the sale,**
> **offering for sale, distribution, or advertising of any goods or**
> **services,"** 15 U.S.C. § 1114(1)(a), or "in connection with any
> goods or services," id. § 1125(a)(1). But courts have been
> reluctant to define those terms narrowly. Rather, as the Second
> Circuit has explained, "[t]he term `services' has been interpreted
> broadly" and so "[t]he Lanham Act has . . . been applied to
> defendants furnishing a wide variety of non-commercial public
> and civic benefits." *United We Stand Am., Inc. v. United We*
> *Stand, Am. N.Y., Inc.*, 128 F.3d 86, 89-90 (2d Cir. 1997).
> [emphasis added]

In the *Taubman,* and *Bosley* cases cited above, infringement was not

found because the websites in question were primarily "gripe" sites and thus

not in competition with, nor did they pretend to be the site of the trademark

holders, which was the key element in the disputed term of "commercial use."[10] Those Defendants prevailed because their use was exactly opposite to the use enjoined herein. The *Taubman* and *Bosley* Defendants were exercising their free speech right of criticism, whereas Appellants were posing as the official LPMI and thus properly enjoined by the District Court

In *Taubman* at 772, the main issue was that "[Defendant's use was not 'in connection with the sale or advertising of goods or services' and there was no likelihood of confusion among consumers," and in *Lamparello* at 312-315, the lack of a likelihood of confusion was the key element examined (due to the distinctly harshly critical nature of the disputed website which no one would reasonably be deceived to believe was authored by Reverend Falwell himself),  and in both, none of the Defendants actually claimed **to be the entity or person identified by the trademarks.**  This conflation plagues the entirety of Appellants' case as demonstrated by the fact that both Appellants and Appellee cite to many of the same cases in their respective briefs.  There are distinctly protected activities that Appellants have, and are continuing to, enjoy, that have not been enjoined.  Only  appropriation of the

---

[10] In *Taubman,* several weblinks that lead to advertisements for products that could be considered in competition with the trademark holder were ordered to be removed while the critical commentary and prior "fan page" uses were considered to be free speech.

identity of the Trademark holder and its Michigan affiliate was enjoined. Specifically, Appellants are the creators of the "gripe" site of lncfight.org and have publicly supported another "gripe" site, lncexposed.com (the owner /creator of that site is unknown), neither of which have ever been the subject of an injunction or take-down request by Appellee.

*Taubman* at 775 said it plainly, "[A]s per the language of the Lanham Act any expression embodying the use of a mark not 'in connection with the sale… or advertising of any goods and services' and not likely to cause confusion is outside the jurisdiction of the Lanham Act."    "[The] Lanham Act is applicable because 'defendant's action in appropriating plaintiff's mark has a connection to plaintiff's distribution of its services,'" *Taubman* at 777, citing *Planned Parenthood Fed'n of Amer. Inc. v. Bucci*, No. 976 Civ. 0629, 1997 WL 133313 (S.D.N.Y. March 24, 1997), aff'd, No. 97-7492, 1998 WL 336163 *4 (2nd Cir. Feb. 9, 1998).

### B.    Lanham Act Protection is not Confined to For-Profit Enterprises

Appellants assert that "use in commerce" as used in the Lanham Act (15 U.S.C. §§1051 et eq) was intended to limit protection solely to for-profit organizations, in complete disregard of the legislative history of the Lanham Act and its invocation of the Commerce Clause:

The history and text of the Lanham Act show that "use in commerce" reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act to profit-seeking uses of a trademark. In 1879, the Supreme Court struck down a federal trademark law because it could not "find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several States, or with the Indian tribes." Since the reach of the statute was not explicitly limited within the confines of Congressional power, the statute was found to be invalid. *The Trademark Cases*, 100 U.S. 82, 96 (1879). The next trademark statute enacted in 1905, therefore, prohibited unauthorized use of a registered trademark "in commerce among the several States, or with a foreign nation, or with Indian tribes," language obviously intended to track the terms of the Commerce Clause. Law of Feb. 20, 1905, ch. 592, Section(s) 16, 33 Stat. 724, 728.

The Lanham Act, enacted in 1946, prohibited unauthorized "use" of a trademark "in commerce." Lanham Act, July 5, 1946, ch. 540, Section(s) 32, reprinted in 1946 U.S.C.C.A.N. 412, 421. The current version of 15 U.S.C. §(s) 1127 provides, in language unchanged since 1946, that "[t]he intent of this chapter is to regulate commerce within the control of Congress . . . ." It also asserts that "'commerce' means all commerce which may lawfully be regulated by Congress." The Senate Committee on Patents stated, in its report accompanying the Lanham Act, that "[t]here can be no doubt under the recent decisions of the Supreme Court of the constitutionality of a national act giving substantive . . . rights in trademarks in commerce over which Congress has plenary power . . . ." S. Rep. No. 79-1333 (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1277. It appears that "use in commerce" denotes Congress's authority under the Commerce Clause rather than an intent to limit the Act's application to profit-making activity. See *Planned Parenthood Federation of America, Inc. v. Bucci*, No. 97 Civ. 0629, 1997 WL 133313, at *4 (S.D.N.Y. March 24, 1997) ("Notwithstanding its jurisdictional 'in commerce' requirement, Section 1114 contains no commercial activity requirement.")
*United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 92-93 (2nd Cir. 1997)

No such requirement of for-profit activity exists in trademark law. All manner of non-profit, altruistic, philanthropic, civic, and political organizations are entitled to trademark protection. The right to enjoin infringement "is as available to public service organizations as to merchants and manufacturers." *N.A.A.C.P. v. N.A.A.C.P. Legal Defense and Educ. Fund*, 559 F. Supp. 1337, 1342 (D.D.C. 1983), rev'd on other grounds, 753 2.d 131 (D.C. Cir.), cert. denied , 472 U.S. 1021 (1985).

The use of the word "commercial" in a Lanham Act context is not intended to pit "for-profit" uses against "non-for-profit" uses but to distinguish between using a mark in the "sale of goods or services in commerce" and uses that are mere expression of opinions such as criticisms or commentary, including political expressions which use a trademark to enable identification of the target of the commentary.  The former falls under the Lanham Act; the latter would be protected speech. Indeed, *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 679 (9th Cir. 2005), citing *United We* Stand at 90 noted that the Lanham Act "does not require any actual *sale* of goods and services. Thus, the appropriate inquiry is whether [Defendant] offers *competing* services to the public… [Defendant's] use of the [Plaintiff's] mark is not in connection with a sale of goods or services — it is in connection with the expression of [Defendant's] opinion *about* [Plaintiff's] goods

and services." [emphasis in original]."  Once again in this case, there is no doubt

that Appellants offer competing services using the Trademark so much so that they

claim to be the actual service provider, the Libertarian Party of Michigan.

### C.    The Lanham Act Protection for Non-Profit Enterprises Necessarily Includes Political Organizations.

The common-sense approach taken in *United We Stand,* at 90-91 (citing to

*Tomei v. Finley*, 512 F. Supp. 695, 698 (N.D. Ill. 1981) (preliminary injunction

issued because of strong likelihood of confusion resulting from political party's use

of acronym designed to deceive voters into thinking the candidate was of the

opposing political party) in which similar First Amendment claims were made

demonstrates the unreasonableness of Appellants' position:

> [Absent the possibility of trademark protection] Any group trading in
> political ideas would be free to distribute publicity statements,
> endorsements, and position papers in the name of the "Republican
> Party," the "Democratic Party," or any other. The resulting confusion
> would be catastrophic, voters would have no way of understanding the
> significance of an endorsement or position taken by parties of
> recognized major names. The suggestion that the performance of such
> functions is not within the scope of "services in commerce" seems to
> us to be not only wrong but extraordinarily impractical for the
> functioning of our political system.

If "political speech" allowed anyone or any group to pose as the Libertarian

Party or the Democratic Party or the Grand Old Party, this would eliminate the

meaning of political parties, and there are no cases that support this position.

-24-

Appellants concede that there are numerous cases in other circuits specifically and unequivocally stating that political party services are services under the Lanham Act, and admit there are no Sixth Circuit cases that contradict this point, instead pointing to a novel limitation on the word "commercial" in a Lanham Act context in a sole dissenting opinion in *Alliance for Good Government v. Coalition for Better Government*, 998 F.3d 661 (5th Cir. 2021) in which the majority opinion clearly applies the Lanham Act to a political organization. Further, political parties have the right to "identify the people who constitute the association, and to limit the association to those people only." *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (1981). *Buckley v. Valeo*, 424 U.S. 1 at 15 (1976) also expressly stated that "The First Amendment protects political association as well as political expression." Political association includes the identification of authorized affiliates, not just identification of general membership.

## VI. THE AMICUS BRIEF

The Tushnet Amici appeared to accept Appellants' mischaracterization of a "sweeping injunction" that would literally prevent Appellants from using the phrase "Libertarian Party" in critical commentary. However, no such "sweeping injunction" exists. The Tushnet Amici agree with Appellee that the Lanham Act

does cover  non-profit speech and activities, particularly when a non-profit speaker provides services "in direct competition with the trademark claimant and thus [is] truly capable of diverting consumers and substituting for demand for the claimant's services" and "in assessing whether the Lanham Act can apply to noncommercial speech, 'the appropriate inquiry is whether [Defendant] offers competing services to the public'" [Amici Curiae Brief, pgs. 8-10, citing *Radiance Found, Inc. v. NAACP*, 786 F.3d 316, 323 (4th Cir. 2015) and *Utah Republican Party v. Herbert*, 141 F. Supp. 3d 1195, 1204 (D. Utah 2015)].

The Tushnet Amici relies on *Alliance for Good Government v. Coalition for Better Government*, 998 F.3d 661 (5th Cir. 2021), in which the Defendant was ordered to stop using only the identical logo, and not the words accompanying the logo.  That case directly supports Appellee in this matter.  The *Alliance for Good Government* Plaintiff was a political organization with an injunction granted by the District Court for its logo.[11]  Although the logo was copied, the names of the groups differed widely (Alliance for Good -v- Coalition for Better) and thus were not considered confusing.  Here, the exact Trademark is being used and enjoined in complete harmony with the *Alliance for Good Government* ruling.  In fact, as the *Alliance for Good Government* court stated (again within the context of a

_____

[11] The Appellate Court did not opine on this issue versus "political speech" as it was not properly raised at the District Court level, merely intimated.

-26-

trademark held by a political organization):

> We must focus, of course, not merely on whether the marks are identical, but on whether the virtually-identical marks are used in a manner that prospective "purchasers" of the two organizations' services (i.e., voters who rely on Alliance and Coalition endorsements) are "likely to believe that the two users are somehow associated." [*Elvis Presley Enterprises, Inc. v.*] *Capece*, 141 F.3d at 201 [141 F.3d 188]. Here we also find the evidence uncontested and overwhelming. It is undisputed that Alliance and Coalition work in the same field (elections), operate in the same market (New Orleans), use the same advertising channels (newspapers, sample ballots, flyers), and sometimes endorse the same or opposing candidates. Consequently, there is no question that the overall similarity of the marks, in the context of their use, creates a likelihood in the minds of voters that the two organizations are "somehow associated." *Capece*, 141 F.3d at 201.

Appellee strongly disagrees with the Tushnet Amici suggestion that a disclosure statement on a website could be sufficient to avoid confusion in this particular instance.  The reality is that such an argument would allow anyone to exactly copy **any** non-profit's trademark and use it directly in the course of providing competing goods and/or services, and then simply state on their website that there is a "dispute" about the governance of the non-profit (regardless of whether this has been resolved within the rules of the non-profit or is at all objectively an actual dispute), the existence of a legitimate dispute would be solely in the discretion of the infringer, effectively nullifying trademark law.[12]  This

---

[12] This also does not consider that offering political party goods and services is not limited to websites where such a "solution" might be *theoretically* feasible but also

would be a recipe for chaos and would have no benefit for anyone. Fraudulently assuming a nonprofit group's name as an identity in no way contributes to First Amendment discourse.  The enjoined activities do not involve mere criticism or commentary for which such a disclaimer might be effective on a case-by-case basis.

Further, the alleged disclaimer on Appellants' website (which did not appear until quite some time after the lawsuit was filed), only added to the Schrödinger-esque confusion by its conflicting claims that, to paraphrase: Appellants both are and are not the affiliate, and perhaps the affiliate is some other group and here is the link to that other group, but they are wrong, we really are the affiliate. It also appeared only on one sub-page while other pages clearly made explicit identification claims, such as Appellants' use of  Appellee's Trademark as a source identifier in their published bylaws. See [Screenshots of website, DE 12-20, 12-21, PAGEID# 503-504], public advocacy statements [Flyer, DE 12-37, PAGEID#581], minutes [Convention Minutes, DE 16-8, PAGEID# 696–712], and meeting advertisements [Emails, DE 12-13, 12-38, PAGEID#516-526, 582-583]  as source

---

includes social media posts, public speeches, campaign finance filings, political committee filings, conventions, and myriad other situations and legal requirements. The inherent legal status of a political party, political action committee, or non-profit advocacy group make this impossible and would entail boundless government entanglement in endless and confusing "disclaiming."

Case: 23-1856    Document: 31    Filed: 01/03/2024    Page: 42


identifiers. The disclaimer noted in Appellants' brief upon which most of their arguments (mistakenly) rely, *Taubman Co. v. Webfeats,* 319 F.3d 770 (6th Cir. 2003) contained a very clear disclaimer on the home page that disavowed any official connection with the trademark holder and operated as a "fan page." The site included the specific disclaimer: "This is an unofficial site. It is not supported by, affiliated with, or related to The Shops at Willow Bend in any way." and included a link to the official site: "The official site is located at www.ShopWillowBend.com"

This is profoundly distinguishable from the present case. The Appellants were not, prior to the injunction, merely presenting objective factual information or critical commentary about the Trademark holder in their activities but were pretending *to actually be* the organization entitled to use the Trademark in Michigan. The remaining permitted websites in the *Taubman* case involved "cybergriping" which have no analog in the preliminary injunction as Appellants' "cybergriping" site remains viewable and has never been part of any injunction. Further, in *Taubman* the Defendant had no off-internet activity, and did not even claim to be an entity of any kind on the claimed infringing website. In the present matter, not only are Appellants claiming a First Amendment right to file financial and campaign reports with government entities under the Trademark, the bylaws

and articles of incorporation that would govern their existence make the explicit claim of identity as the Libertarian Party of Michigan and affiliation with Appellee.

Selected portions of Appellants' imposter website just prior to the Injunction demonstrating the use of Appellee's trademarks  to misidentify Appellants are found in the record at DE 12-20 and 12-21.

see:



Bylaws:[13]



Membership:



---

[13] Appellants Bylaws were amended on April 1, 2023, at their illegitimate convention but this portion remains identical.

The completely circular and confusing non-disclaimer upon which they rely, did not appear until long after the cease and desist was sent. It is completely inadequate to "cure" misappropriation of an entire identity with a non-disclaimer that basically claims to be legitimate entity if only the recalcitrant Trademark holder would recognize them. That is the very point. The Appellee does not recognize them as valid users of its Trademark in that context. The Appellee would also strongly reiterate that the activities and services of a political party by its very nature extend far beyond a website.

### VII.  Appellants' Reliance on *Taubman* is Misplaced.

*Taubman Co. v. Webfeats,* 319 F.3d 770 (6th Cir. 2003) involved a case where there was an improper injunction against a Defendant who was not engaged in direct competition with the trademark holder and did not claim to be authorized to use the trademark or assume that identity, which was the precise reason for the holding that the Lanham Act could not be used to enjoin the Defendant's "non-commercial" speech, i.e., his critical commentary and fan site.

The Appellants engage in a circular exercise in an attempt to prove that the "commercial" requirement in *Taubman* excludes all non-profit entities[14] by not

---

[14] Appellants admitted that there was no Sixth Circuit case that stated that political parties were exempted under Taubman, and their argument would prohibit any non-profit from having Lanham Act protection in the area of competing goods and services in addition to the fact that a vast number of non-profits regularly engage in

only going out of this circuit, but retreating to a case outside the Lanham Act

context (*Central Hudson Gas & Elec. Corp. v. Public Service Commission of New*

*York*, 447 U.S. 557, 561 (1980)), which is represented to state that  "commercial"

must mean "related solely to the economic interests of the speaker and its

audience" and which then continues to state in the same paragraph, "Commercial

expression not **only** serves the economic interest of the speaker, but also assists

consumers and furthers the societal interest in the fullest possible dissemination of

information." [emphasis added] The sentence quoted by Appellants merely referred

to the scope of a particular regulation, not the full scope of commercial expression,

but more relevantly, it was certainly not written in the context of the Lanham Act.

*Bosley*, which **is** in a Lanham Act context, clearly states at 679 that *no actual sale*

*of goods or services* is required to run afoul of the Lanham Act, *only competing*

*services,* and was clearly aware of the *Taubman* decision at 680.  Additionally, the

*Central Hudson* case was cited by Tushnet Amici in support of their position that

critical commentary is what is entitled to First Amendment protection, which once

again, was not enjoined in this matter.

   Further, once again contrary to Appellants, *United We Stand*  is not in fact

an "outlier" and correctly noted that other cases applying the Lanham Act to public

political activities as part of their organization's purpose and mission.

and civic organizations include: *Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity*, 654 F. Supp. 1095, 1101 (D.N.H. 1987) (membership in collegiate Greek-letter fraternity and solicitation of alumni contributions); *American Diabetes Ass'n, Inc. v. Nat'l Diabetes Ass'n*, 533 F. Supp. 16, 20 (E.D. Pa. 1981) (solicitation of donations), aff'd, 681 F.2d 804 (3d Cir. 1982); *United States Jaycees v. Philadelphia Jaycees*, 490 F. Supp. 688, 691 (E.D. Pa. 1980) (public service projects including Special Olympics, Christmas shopping for orphans, and half-way houses), rev'd on other grounds, 639 F.2d 134 (3d Cir. 1981); *United States Jaycees v. San Francisco Junior Chamber of Commerce*, 354 F. Supp. 61, 64, 65 (N.D. Cal. 1972) (meetings, competitions, and other special events for young men interested in community affairs; community betterment programs), aff'd, 513 F.2d 1226 (9th Cir. 1975); *Brach Van Houten Holding, Inc. v. Save Brach's Coalition For Chicago*, 856 F. Supp. 472, 475-76 (N.D. Ill. 1994) (political group engaged in soliciting donations, preparing press releases, holding public meetings and press conferences, and organizing on behalf of its members' interests, was perfroming services within the meaning fo the Lanham Act); 856 F. Supp. 472, 475-76 (N.D. Ill. 1994). *Committee for Idaho's High Desert v. Yost*, 881 F. Supp. 1457, 1470-71 (D. Idaho 1995), aff'd, 92 F.3d 814 (9th Cir. 1996) (non-profit organization engaged in dissemination of information about environmental causes via news

releases, newsletters, and public advocacy was entitled to Lanham Act protection for its trade name even if it did not "place products into the stream of commerce.")[15] More recently and directly on point to the present case is the recently entered preliminary injunction in *Republican National Committee v. Canegata et. al.*, No. 3:22-cv-0037 (V.I., St. Thomas and St. John Div.) relying on *U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 142-43 (3d Cir. 1981), to extend the reasoning of *Little Caesar Enterprises, Inc. v. R-J-L Foods, Inc., 796 F. Supp. 1026, 1036 (E.D. Mich. 1992)* and *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 195 (3d Cir. 1990) to political parties. "When a "splinter group [of the GOP] continue[s] to use" the trademarks that it no longer has permission to use, such a "concurrent use of the ... marks by both parties" constitutes infringement by the splinter group." [Memorandum Opinion, DE 12-33, PAGEID# 558-573].

  While there are certainly gray areas in the lines of demarcation of the reach of the Lanham Act certain sure and simple conclusions can be drawn:  mere commentary using the trademark is permitted and direct appropriation in a use that involves competing goods or services is not permitted whether or not a traditional

---

[15] While not cited in this list as it came down over a decade later, there is also notably *Alliance for Good Government v. Coalition for Better Government*, 998 F.3d 661 (5th Cir. 2021) (political organization endorsing candidates for office).

"sale" is involved.  Further, this protection extends to public service organizations, political parties, and charities, just as clearly as it does to factories and storefronts.

### A. False Designation of Origin and Affiliation is not Mere Criticism and is not Protected Speech Under the First Amendment.

As noted thoroughly above, Appellants have a right to express their political opinions about the Libertarian Party or any other party, as pointed out in Appellants' case citations in the District Court and in their Brief before this Court, but they must properly identify themselves, not deceive the public as to the source of those opinions. Appellants' use of "Libertarian Party" as the name of their organization is not the expression of a political opinion and is thus not political speech; it is simply a misdirection as to the origin of Appellants' political speech. All of the case law relied upon by Appellants thus far makes this distinction, *i.e.,* using a trademarked name to identify the subject of critique is protected free speech; however, identifying as that entity by using that entity's trademark to self-identify your own group is not free nor political speech, it is trademark infringement.

## VIII.  THE DISTRICT COURT PROPERLY REFRAINED FROM INTERFERING IN THE GOVERNANCE OF A POLITICAL PARTY.

### A. A Non-Licensed Group Cannot Claim a License for Purpose of Impersonating the Valid License Holder.

The bottom line in this case is that Appellee has the right to recognize its

-35-

state-level affiliates and has the duty to ensure there is only one state-level affiliate in each state pursuant to its own bylaws [NLP bylaws, DE 12-7, PAGEID# 459-460]. Appellee secured an incontestable federal trademark registration in order to protect its affiliates and the voting public from the inevitable deception that would arise should an unrecognized group attempt to falsely identify itself as a state-level affiliate or as a National imposter. Appellee notified Appellants that they were not authorized to use the Trademark in that manner [Cease and Desist Letter, DE 12-10, PAGEID# 474-476].[16] Indeed, "Courts are in agreement that a trademark license is terminable at will by the trademark owner, even where it is an express license... and certainly when the license is only implied," *Chi. Mercantile Exch. Inc. v. Ice Clear US, Inc.* 2021 WL 3630091, at *13 (N.D. Ill. Aug. 17, 2021); see also *Dial-A-Mattress Operating Corp. v. Mattress, Inc.*, 847 F. Supp. 18, 19 n.1 (E.D.N.Y 1994 ("An agreement conferring a license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable-at-will by the licensor.") [cited in Memorandum Opinion, DE 12-32, PAGEID# 568-570].

Appellants cite to *O'Brien v. Brown*, 409 U.S. 1, 4 (1972) to imply that "intra-party disputes" in political parties are best decided by delegates at a convention. Trademark infringement is not an intra-party dispute. This is the

---

[16] This alone rebuts Appellants' assertions that the use was not "without consent." [Appellants' Brief, page 15]. It was expressly without consent.

quote used by the Appellants: ""It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes . . . ." However, the full quote includes: ". . .the proper forum for determining intra-party disputes **as to which delegates shall be seated**." [emphasis added to show omitted words] A principle can be derived from that case, which is found in *Cousins v. Wigoda*, 419 US 477 (1975), that the internal rules of the political party are supreme, which by analogy would include the internal rules which have settled this dispute here, namely Article V of the LPMI bylaws (footnote 2, *supra*) and the decisions of Appellee as the governing body of the NLP through its own bylaws since *Cousins* is based upon the principle that "[t]he National Democratic Party and its adherents enjoy a constitutionally protected right of political association" (*Id*. at 487). It is noted once again that Appellants never attempted to exercise their internal appeal rights under the NLP bylaws which would be respecting the political party's own internal processes. While Appellants are *members* and can fully identify as such, they are not the LNC-recognized *affiliate,* the Libertarian Party of Michigan. Therefore, unless the LPMI amends its bylaws to remove that final authority from the Judicial Committee, that provision is binding and should be honored by government and courts alike (see also *Slattery v. Madiol*, 257 Mich.

-37-

App. 242, 250, 668 NW2d 154 (2003) noting that bylaws are generally construed with the same rules for statutory construction in that courts must first look to the specific language of the bylaw).

### B.    Appellants' Arguments Entail that any Alleged Governance Dispute is Irrelevant.

If the identification of oneself as a non-profit public issue advocacy group, civic organization, or political party/political action committee holding a trademark in their name is in fact an **absolute First Amendment right**, then not even a pretense of a governance dispute is necessary.  Any competitor could set up an imposter organization at will using Appellee's "Libertarian Party" trademark as its name to cause voter confusion, degrade voter confidence, and deny the Libertarian Party the recognized right to define its own identity through group association, *Buckley* at 14-15 (1976):

> In a republic where the people are sovereign, the ability of the
> citizenry to make informed choices among candidates for office is
> essential, for the identities of those who are elected will inevitably
> shape the course that we follow, as a nation. As the Court observed in
> *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 [ 91 S.Ct. 621, 625, 28
> L.Ed.2d 35] (1971), "it can hardly be doubted that the constitutional
> guarantee has its fullest and most urgent application precisely to the
> conduct of campaigns for political office." The First Amendment
> protects political association as well as political expression. The
> constitutional right of association explicated in *NAACP v. Alabama*,
> 357 U.S. 449, 460 [ 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488] (1958),
> stemmed from the Court's recognition that "[e]ffective advocacy of
> both public and private points of view, particularly controversial ones,

-38-

is undeniably enhanced by group association."

Additionally, all any opponent of the Libertarian Party would need to do in Michigan to deny Appellee's Presidential candidate access to the general election ballot would be to set up a rival national Libertarian Party claiming a First Amendment right to do so as "protected speech," as the Michigan Bureau of Elections denied the Reform Party ballot access due to that very situation. The implications of this argument extend far beyond the state of Michigan, negatively impacting every single state-level affiliate not just of the Libertarian Party, but of every political party, and potentially every non-profit organization that holds minority views upsetting to more powerful adversaries.

In addition, the Defendants' position on contract rights in their brief is at odds with their stated position on free political speech. If any group of Libertarian Party members can identify as The Libertarian Party, then what "contractual right" could be possessed by Defendants?

## IX.    THE DISTRICT COURT PROPERLY BALANCED EQUITABLE FACTORS.

In the sixth Circuit, when considering a motion for a preliminary injunction, the Court considers: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and

(4) whether the public interest would be served by the issuance of an injunction." *Graveline v. Johnson*, 747 F. Appx. 408, 412 (6th Cir. 2018) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)) also *U.S. v. Edward Rose Sons*, 384 F.3d 258, 261 (6th Cir. 2004). Also see *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) with a "factors to be balanced" not required.

Appellants do not deny that Appellee owns a valid federally registered incontestable Trademark; that Appellants were using this Trademark to identify as the LPMI; and that Appellants were asked to cease. The Appellants' claim of erroneous findings of fact of the District Court concentrate on the equitable factors while not giving specifics on these errors other than the disagreement already expressed at the hearing.

### A.    The State and the Public have an Interest in the Orderly Identification of Officially Recognized Political Parties and Political Action Committees.

It is a long-standing principle that the state has a compelling public interest in the foundational political processes of the country. For example, in the FEC Advisory Opinion 2016-17, [FEC Letter, DE 12-14] PAGEID# 488-492] the Commission determined one essential prong for the qualification of the LPMI as a state committee of a national political party (i.e., an affiliate) is that they are

recognized as part of the official structure of the NLP.  The Michigan Bureau of Elections recognized the NLP-recognized affiliate on the same grounds [Evidence of Additional Confusion, ED 20-1, PAGEID# 1128-1133].  If any person, simply by virtue of political partisan registration or membership could claim to be the party itself, and file official reports for the party, which is claimed by Appellants to be a First Amendment right, there would be absolutely no way to monitor minimal compliance with campaign finance and contribution regulations on either the state or federal level.  The state would also have no way of knowing which candidates are entitled to the partisan "Libertarian Party" ballot line for either statewide races or the rapidly approaching Presidential/Vice Presidential election or what entity was entitled to submit its Presidential Electors slate.

The public interest warrants granting relief to the LNC. "Public interest ... in a trademark case ... is most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 197 (3d Cir. 1990); accord *Kos Pharmaceuticals, Inc. v. Andrx Corp.,* 369 F.3d 700, 730 (3rd Cir. 2004), "The most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." "Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public

interest." *S&R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 379 (3rd Cir. 1992).

The likelihood of confusion and actual confusion is definite here because Appellants are knowingly and unlawfully using Appellee's actual Trademark and those of its recognized Michigan affiliate and purposefully generating such confusion.

This kind of confusion is especially not in the public's interest; as just one example, federal law already makes it a crime to make false representations in solicitations for political donations. 18 U.S.C. §1341; 52 U.S.C. §30124. The activities of Defendant Thornton-Canny are already the subject of an FEC complaint filed by the LNC for her fraudulent identification of herself as treasurer of the recognized state committee of the NLP [Complaint, DE 1, PAGEID# 7]. Further, with all the current attention on elections and election integrity, confusion in the identity of political parties is particularly damaging to the public interest. In this matter, "an injunction would eliminate confusion generated by [Defendants'] infringement." *Opticians Ass'n*, 920 F.2d at 198.

This is all in addition to the District Court's explanation in the hearing transcript granting the preliminary injunction that "preventing consumer confusion and deception in protecting the trademark holder's property interest in the mark is in the public interest," referencing *Lorrillard v. Amouri*, 453 F.3d 377 (6th Cir.

-42-

2006) [Hearing Transcript, DE 22, PAGEID# 1161-1162]

**B.    Abolishing Protection for the Identity of Political and Public Policy Advocacy Groups would be Potentially Disastrous.**

The implications of Appellants' claims are far-reaching.  There are about 500 active federal trademark registrations listing "political party services" or "political action committee services" and numerous others listing other political activities, in addition to many pending applications listing the same services. Some of these trademark registrations have reached incontestable status. Appellants' argument is a collateral attack on the United States Patent and Trademark Office, essentially claiming that all of these registrations are void as not relating to commerce that can be regulated by Congress. An adverse decision would therefore create substantial uncertainty for a wide swath of organizations beyond the Libertarian Party and other political organizations, including for charities and other advocacy groups. Nonprofit entities of all kinds would be vulnerable to having their identities co-opted and subverted, with a high risk of resulting deception to the public.

**X.    CONCLUSION**

No matter the outcome of this appeal or the underlying District Court case, absent the LNC disaffiliating the currently recognized Libertarian Party of Michigan for cause and re-affiliating with another group led by Appellants, they are not, and will not be, the Libertarian Party of Michigan.  The only question

-43-

before this Court is whether the political process and the public equities are best served by allowing the protection of that recognized entity's identity in its provision of political party services under the Lanham Act, or by allowing an imposter group to hijack that identity and unleash chaos, setting the precedent for this to unfold on a much larger scale with all political parties as well as non-profit public policy advocacy groups.  The Appellee answers the former, and urges the Court to reject the latter and uphold the District Court's Order Granting the Plaintiff's Motion for Preliminary Injunction.

Respectfully Submitted

January 3, 2024                    /s/ Joseph J. Zito
                                   Joseph J. Zito
                                   DNL ZITO CASTELLANO
                                   1250 Connecticut Avenue, NW, Suite 700
                                   Washington, DC 20036
                                   (202) 466-3500
                                   jzito@dnlzito.com

                                   Attorneys for *Plaintiff-Appellee*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type- Style Requirements

1.    This document complies with the word limit of Fed. R. App. P. 32(A)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 11,905 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14 Point,  Times New Roman.

Respectfully Submitted

January 3, 2024                   /s/ Joseph J. Zito
                                  Joseph J. Zito
                                  DNL ZITO CASTELLANO
                                  1250 Connecticut Avenue, NW, Suite 700
                                  Washington, DC 20036
                                  (202) 466-3500
                                  jzito@dnlzito.com

                                  Attorneys for *Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2024, a copy of the foregoing Appellee's Brief is being filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

 /S/ Joseph J. Zito

Joseph J. Zito

## DESIGNATIONS OF COURT RECORD

| Docket Entry No. | Description | PageID# |
|---|---|---|
| 1 | Complaint | 1-19 |
| 12 | Motion for Preliminary Injunction | 373-424 |
| 12-3 | Articles of Incorporation and Bylaws for the Libertarian Party of Michigan Executive Committee (Plaintiff's Exhibit 1) | 432-445 |
| 12-4 | TESS Print-Out for Libertarian Party Trademark (Plaintiff's Exhibit 33) | 446-447 |
| 12-7 | National Libertarian Party Bylaws (Plaintiff's Exhibit 5) | 451-467 |
| 12-10 | Cease and Desist letter from LNC to Joe Brungardt dated February 16, 2023 (Plaintiff's Exhibit 8) | 474-476 |
| 12-12 | MBE website print-out | 478 |
| 12-13 | FEC filings (incorrectly identified in Appellants' Designation of Court Documents as LARA filing) (Plaintiff's Exhibit 11) | 479-487 |
| 12-14 | FEC Letter November 17, 2018 | 488-492 |
| 12-16 | LARA Filing (Plaintiff's Exhibit 14) | 494-496 |
| 12-18 | Spoofed email dated March 3, 2023, from Appellants with call to convention in Lansing for April 1, 2023 (Plaintiff's Exhibit 16) | 498-499 |
| 12-20, 12-21 | Screenshot of Appellants' former website showing | 503-504 |

| | | |
|---|---|---|
| | purpose to affiliate with national Libertarian Party and donation page (Plaintiff's Exhibit 19) | |
| 12-28 | LPMI Bylaws adopted June 26, 2021 (Plaintiff's Exhibit 26) | 516-526 |
| 12-29 | LPMI Judicial Committee Decision (Plaintiff's Exhibit 27) | 527-539 |
| 12-30 | LPMI meeting minutes dated January 25, 2023(Plaintiff's Exhibit 28) | 540-553 |
| 12-31 | Notice dated January 30, 2023, of LPMI special convention on April 1, 2023, in Wixom (Plaintiff's Exhibit 29) | 554-555 |
| 12-32 | Notice dated January 31, 2023, of Appellants' convention on April 1, 2023, in Wixom (Plaintiff's Exhibit 30) | 556-557 |
| 12-33 | Memorandum Opinion in Case No. 3:22-cv-0037 (Plaintiff's Exhibit 31) | 558-573 |
| 12-37 | Flyer by unauthorized group (Plaintiff's Exhibit 35) | 581 |
| 12-38 | Email dated May 25, 2023, to disregard convention notice of recognized Michigan affiliate (Plaintiff's Exhibit 36) | 582-583 |
| 16-8 | Defendants' Convention Minutes | 16-8 |
| 17-2 | Second Declaration of Andrew Chadderdon (Plaintiff's Exhibit 41) | 826-840 |
| 17-3 | Declaration of Angela McArdle (Plaintiff's Exhibit 42) | 842- |
| 17-4 | Second Declaration of Caryn Ann Harlos (Plaintiff's | 846-858 |

| | Exhibit 43) | |
|---|---|---|
| 17-5 | National Judicial Committee decision in McVay v LNC and Hinds v LNC (Plaintiff's Exhibit 44) | 860-874 |
| 17-8 | Opinion of Jonathan M. Jacobs dated November 29, 2022 (Plaintiff's Exhibit 47) | 950-954 |
| 17-9 | LARA filing (Plaintiff's Exhibit 48) | 955 |
| 17-10 | LARA filing (Plaintiff's Exhibit 49) | 956-957 |
| 17-11 | Opinion of Jonathan M. Jacobs dated July 17, 2023 (Plaintiff's Exhibit 50) | 958-966 |
| 17-12 | LPMI Meeting Minutes dated January 6, 2023 (Plaintiff's Exhibit 51) | 967-968 |
| 17-13 | Petition for special convention (Plaintiff's Exhibit 52) | 969-1044 |
| 17-17 | Email from Mike Saliba dated June 15, 2023, regarding convention of recognized affiliate (Plaintiff's Exhibit 56) | 1048-1050 |
| 17-21 | LNC Email ballot 20230206-02 (Plaintiff's Exhibit 60) | 1066 |
| 17-23 | Emails between Mike Saliba and Caryn Ann Harlos (Plaintiff's Exhibit 62) | 1074-1077 |
| 17-28 | Appeal of Andrew Chadderdon to LPMI Judicial Committee | 1082-1094 |
| 20-1 | Evidence of additional confusion with MBE (Plaintiff's Exhibit 70) | 1128-1133 |
| 21 | Order Granting Preliminary Injunction | 1134-1135 |
| 22 | Preliminary Injunction Hearing Transcript | 1136-1164 |
| 25 | Defendants' Motion to Stay Injunction | 1168-1177 |
| 32 | Order Denying Motion to Stay Pending Appeal | 1235-1242 |